**AMERICAN EXPORT ISBRANDTSEN LINES, INC., et al., Petitioners,**

v.

**The FEDERAL MARITIME COMMISSION**

and

**The United States of America, Respondents,**

**Sapphire Steamship Lines, Inc., Intervenor.**

**No. 20414.**

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 12, 1967.

Decided June 12, 1967.

---

Mr. Robert N. Kharasch, Washington, D. C., with whom Mr. George F. Galland, Washington, D. C., was on the brief, for

petitioner States Marine Lines, Inc. and certain other petitioners, argued for all petitioners.

Mr. John E. Cograve, Deputy Gen. Counsel, Federal Maritime Commission, of the bar of the Supreme Court of Virginia, pro hac vice, by special leave of court, with whom Asst. Atty. Gen., Donald F. Turner, Messrs. James L. Pimper, Gen. Counsel, Robert N. Katz, Sol., Walter H. Mayo III, Atty., Federal Maritime Commission, and Irwin A. Seibel, Atty., Dept. of Justice, were on the brief, for respondents.

Messrs. Warner W. Gardner and Robert T. Basseches, Washington, D. C., were on the brief for petitioner American Mail Line, Ltd., and others.

Messrs. Richard W. Kurrus and James N. Jacobi, Washington, D. C., were on the brief for petitioner American Export Isbrandtsen Lines, Inc.

Messrs. Elmer C. Maddy, New York City, and Ronald A. Capone, Washington, D. C., were on the brief for petitioner Atlantic & Gulf American Flag Berth Operators.

Mr. Sterling F. Stoudenmire, Jr., Mobile, Ala., was on the brief for petitioner Waterman SS. Corp.

Mr. Mitchell W. Rabbino, New York City, was on the brief for intervenor, Sapphire SS. Lines, Inc. Mr. George Blow, Washington, D. C., also entered an appearance for intervenor, Sapphire SS. Lines, Inc.

Before PRETTYMAN, Senior Circuit Judge, TAMM and LEVENTHAL, Circuit Judges.

TAMM, Circuit Judge.

In this Federal Maritime Commission case, the petitioners, various American-flag ocean common carriers, challenge the Commission's determination that a program for procurement of ocean transportation of military cargoes adopted by the Military Sea Transportation Service (hereinafter MSTS) does not violate section 14b or the provisions of the first paragraph of section 16 of the Shipping Act, 46 U.S.C. §§ 813a, 815 (1958), as amended, (Supp. I, 1966).[1] Petitioners allege that the adoption and implementation of this program results in the formulation of dual rate contracts between the Government as shipper and the ocean-going carriers of the Government cargo. Since section 14b requires all dual rate contracts to be filed with the Commission (and these contracts were not filed), the Government, petitioners allege, is in violation of section 14b. They further allege that this program violates the first paragraph of section 16 because the bidding requirements are "unjust or unfair device[s] or means" within the meaning of that section of the Shipping Act. The facts and circumstances which have precipitated this litigation are somewhat involved and will require some preliminary discussion before we proceed to decision of the case.

I.

Prior to April 4, 1966, MSTS had transported its not insubstantial cargo principally on American-flag conference vessels.[2] MSTS' long-standing policy theretofore was to negotiate rates both with individual carriers and with shipping conferences acting in concert pursuant to agreements approved by the Commission under section 15 of the Shipping Act. These rates were the same for all American-flag carriers, and cargo was allocated among all carriers in proportion to their number of sailings.

On April 4, 1966, MSTS announced its intention to abandon these negotiation procedures. On June 25, 1966, MSTS issued Request for Proposals No. 100 (hereinafter RFP 100), which contained the rates, terms, and conditions under which the Department of Defense proposed to extend competitive bidding methods of procurement of ocean trans-

---

1. See Appendix, where the pertinent parts of the sections are reproduced.

2. Nearly all military cargo moves in American bottoms by virtue of the Cargo Preference Act, 10 U.S.C. § 2631 (1959).

portation to Department of Defense cargoes.

Under RFP 100, any United States flag line desiring to carry military cargo (designated the offeror under RFP 100) must submit a "basic offer," which is, in effect, a quotation of the rates at which the offeror will carry military cargoes. These rates must be guaranteed for one year. The offer must be submitted under seal, and the offeror must certify that he has reached his bid or rate quotation independently, without consultation with or disclosure to any other offeror, or, in the alternative, he must certify the conditions and circumstances of the consultation or disclosure, if any. Once the basic offers have been submitted and analyzed, MSTS will enter into Shipping Agreements with the selected offerors. A Shipping Agreement itself does not commit MSTS to the shipment of any cargo with the line entering into the agreement. It sets forth the rates and other basic conditions under which the carrier offers to transport such cargo as may be tendered from time to time by the Government. Actual bookings of cargoes under RFP 100 are made, first, with the carrier who has offered the lowest rate, provided he offers suitable space and an acceptable schedule of delivery. Failing this, the cargo is booked with the line offering the next lowest rate, and this seriatim procedure continues until enough suitable carriers are selected to exhaust the available cargo.

Upon the award of Shipping Agreements for a given trade, the holders thereof are "protected from competition" in the following manner: if another holder of a Shipping Agreement reduces his rate, his competitive position vis-à-vis other holders is considered on the basis of his original bid. If a new carrier enters the trade, he may be awarded a Shipping Agreement, or a negotiated rate level, but his services are used only if the original holders on that route cannot provide suitable service. Finally, lines which either did not bid or were not awarded Shipping Agreements are used only if the services or capabilities of the holders on the route are inadequate.

Under RFP 100, a second type of offer may be made. Any line which makes a basic offer may also submit an alternate offer which seeks a "Cargo Commitment" from MSTS to ship a stated minimum volume of cargo on a specified number of sailings on a particular route. Offers based on minimum volume will not be considered unless the line has also submitted a basic offer for an "open-end" contract (without volume specification). When a minimum volume offer is accepted and a Cargo Commitment is issued, the line agrees to furnish sufficient space for the minimum amounts of cargo to be booked on each of its sailings. Default on the part of either party results in payment of "dead freight" under the contract. In RFP 100, MSTS advised that Cargo Commitments will be made, if found to be in the best interest of the Government,[3] but that it was not contemplated that Cargo Commitments awards would exceed fifty percent of the total requirement on any given trade route, or that, except for special services, the Government would commit itself to use more than approximately fifty percent of the space of any single carrier on a given route.

Shortly after the issuance of RFP 100 by MSTS, petitions were filed with the Maritime Commission by our present petitioners requesting declaratory orders that RFP 100 is unlawful in that it allegedly violates a number of provisions of the Shipping Act.[4] The Commission

3. See Appendix, page 624.

4. The petitioners asserted that the procurement procedures proposed would result in unfair and unjustly discriminatory contracts based on the volume of freight, in violation of section 14 Fourth, 46 U.S.C. § 812 (1958), as amended (Supp. I, 1966); that it would represent a dual rate contract which must be approved under section 14b by the Commission prior to utilization in the foreign commerce of the United States; that it would constitute an unjust or unfair device or means for obtaining transportation at reduced

dismissed the petitions for declaratory relief as premature insofar as the petitions sought determinations under various sections of the Act that would turn on the level of rates apprehended to result from the bidding, e. g., as likely to be noncompensatory and hence violative of section 18(b) (5). It entertained the petitions insofar as questions were raised under sections 14b and 16 of the Act. On August 9, 1966, it issued the decision here under review. In its Report, the Commission ruled, *inter alia,* that the new procurement system and Cargo Commitment feature was not a dual rate contract within the meaning of section 14b requiring Commission approval as a condition of use and that the requirement that bids submitted under the proposed competitive procurement program must be under seal and "secret" did not constitute an unjust or unfair device or means within the meaning of the first paragraph of section 16.

## II.

Petitioners challenged the legality of RFP 100 (both before the Commission and here) on numerous grounds. They argue that the contracts for ocean carriage of military cargo entered into pursuant to this program are dual rate contracts governed by section 14b of the Shipping Act. This section, enacted in 1961, was intended, petitioners allege, to be a comprehensive, remedial legislative pronouncement designed to control the form and content of all tying arrangements between shippers and carriers. Petitioners argue further that section 14b explicitly covers contracts where the

shipper provides "all or a fixed portion" of its cargo to carriers in return for lower rates and that this is precisely what the contracts under RFP 100 do. Finally, with respect to section 14b, petitioners argue that section 14b contains an exception for some types of cargo, but not for cargo shipped by Government agencies. They point to the fact that during the hearings which culminated in the enactment of section 14b, the Comptroller General of the United States requested Congress to accord special treatment to Government cargo and that a clause providing special treatment for Government cargo appeared in the proposed legislation at one time but that this clause was subsequently dropped. It follows from this, petitioners argue, that Congress did not intend Government cargo to receive special treatment and that such cargo is subject to section 14b.

With respect to section 16, petitioners argue that the bidding requirements of RFP 100 are unjust or unfair devices or means within the meaning of those terms under the first paragraph of section 16. This follows, petitioners allege, because operations under RFP 100 will be marked by secrecy and concealment and will effectively destroy all competition for military cargo.

In its decision, the Commission held that the Cargo Commitment entered into beween the Government as shipper and the carrier was not a dual rate contract within the meaning of section 14b. The Commission held, rather, that the Cargo Commitment is a "contract based upon * * * volume of freight" within the meaning of section 14 Fourth of the

rates, which is prohibited by the first paragraph of section 16 and by section 16 Second of the Act, 46 U.S.C. § 815 (1958), as amended, (Supp. I, 1966) that it would result in undue or unreasonable preference prohibited by section 16 First, and that it would result in unjustly discriminatory rates in violation of section 17 of the Act, 46 U.S.C. § 816 (1958) and rates so unreasonably low as to be detrimental to the commerce of the United States and subject to disapproval under section 18(b) (5) of the Act. 46 U.S.C. § 817 (1958), as amended, (Supp. I,

1966). With the exception of the issues raised under section 14b, section 15, the first paragraph of section 16, and section 16 Second, the Commission denied the petitions as to all other issues raised on the ground that those questions were premature, did not raise justiciable issues, and that the additional questions could only be resolved after MSTS and the carriers had entered into the arrangements contemplated by RFP 100. On appeal, the issues have been limited to the section 14b and the first paragraph of section 16 challenges.

Shipping Act.[5] The critical language in section 14b, the Commission noted, is "all or any fixed portion of his [shipper's] patronage." The Commission determined that RFP 100 dealt with "minimum amounts" of cargo rather than with "all or a fixed portion." Under a Cargo Commitment, the Commission explained, MSTS obligates itself to furnish a specified volume of cargo per sailing for a fixed number of sailings. However, no Cargo Commitment would be for "all" of MSTS' "patronage" on a given route since, as a practical matter, no carrier is large enough to handle "all" of MSTS' cargo on any given route.[6] Thus, the question, as the Commission saw it, was whether "fixed portion" in section 14b could be equated with the "minimum amount" provisions of the Cargo Commitment. The Commission did not find them synonymous. It explained in its decision that:

> "The patronage referred to in section 14b is quite obviously the sum total of the particular merchant's foreign exports. Ideally, the dual rate contract commits all of these exports to move on conference vessels. The very purpose of the exclusive patronage or dual rate system is to tie to the conference as much of the total export movement in a given trade as possible. In this way, the conference counters competition from the so-called independent or nonconference operator. Where the contract calls for 'all' of the merchant's patronage, no problem is presented. But what of the 'fixed portion' referred to in 14b? How is this to be determined? Petitioners would equate 'fixed portion' with 'minimum amount.' We don't find them synonymous, however." [Footnote omitted.]

In further explicating its reasons for not finding these terms synonymous, the Commission determined that the "fixed portion" provision in section 14b referred to a "fixed percentage" or an "invariable part of the whole" of a merchant's patronage. The minimum amount of cargo envisioned under a Cargo Commitment does not, the Commission reasoned, refer to a fixed portion or a fixed percentage of the shipper's patronage so as to be embraced within section 14b. Rather, the minimum amount of cargo referred to in the Cargo Commitment partakes more in its nature of the volume type contract embraced within section 14 Fourth, since the Government commits itself "to ship a minimum volume of cargo for a specified number of sailings on a particular route," and this minimum volume is not determined on the basis of any fixed portion or percentage of the Government's shipments.

In addition to the foregoing, the Commission referred, in support of its decision, to the history of the dual rate legislation, particularly as such legislative history reflected congressional reaction to the Supreme Court's decision in Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct 851, 2 L.Ed. 2d 926 (1958). In *Isbrandtsen*, the Supreme Court struck down the exclusive patronage dual rate contract of the Japan-Atlantic and Gulf Freight Conference as unlawful under section 14 Third of the Shipping Act. The Court held the contracts to be such, in spite of arguments to the contrary, that the contracts had been used in international trade since the passage of the Shipping Act in 1916 and that they were necessary to the maintenance of the conference system. The contracts were declared illegal under section 14 Third, since they had as their purpose and effect the stifling of competition of independent carriers.

In the course of outlawing the contracts thereunder consideration, the Court recognized the legality of other contracts which were described as being in the nature of "requirements con-

---

5. See Appendix, page 622.

6. The Commission noted that MSTS cargo amounted to $282.6 million out of a total of $646.8 million of earnings for the United States flag merchant marine in 1964. This figure, in an indirect way, gives some indication of the great magnitude of military cargo carried.

tracts". The Court described these other, legal contracts in these terms:

> "Such contracts are made for the account of all the lines in the agreement, each carrying its proportion of the contract freight as tendered from time to time. The contracting lines agree to furnish steamers at regular intervals and the shipper agrees to confine all shipments to conference steamers, and to announce the quantity of cargo to be shipped in ample time to allow for the proper supply of tonnage. The rates on such contracts are less than those specified in the regular tariff, but the lines generally pursue a policy of giving the small shipper the same contract rates as the large shippers, i. e., are willing at all times to contract with all shippers on the same terms." 356 U.S. at 493–494, 78 S.Ct. at 859. (Quoting from the *Alexander Report*, H.R. Doc. No. 605, 63d Cong., 2d Sess., p. 290.)

The Court went on to note that:

> "These contracts were very similar to ordinary requirements contracts. They obligated all members of the Conference to furnish steamers at regular intervals and at rates effective for a reasonably long period, sometimes a year. The shipper was thus assured of the stability of service and rates which were of paramount importance to him. Moreover, a breach of the contract subjected the shipper to ordinary damages." 356 U.S. at 494, 78 S.Ct. at 859.

The Court distinguished these lawful contracts from the exclusive patronage dual rate contracts which it had before it and which it found illegal, saying of these illegal contracts:

> " * * * [T]he dual-rate contracts here require the carriers to carry the shipper's cargo only 'so far as their regular services are available'; rates are 'subject to reasonable increase' within two calendar months plus the unexpired portion of the month after notice of increase is given; '[e]ach Member of the Conference is responsible for its own part only in this Agreement'; the agreement is terminable by either party on three months' notice; and for a breach, 'the Shipper shall pay as liquidated damages to the Carriers fifty percentum (50%) of the amount of freight which the Shipper would have paid had such shipment been made in a vessel of the Carriers at the Contract rate currently in effect.' Until payment of the liquidated damages the shipper is denied the reduced rate, and if he violates the agreement more than once in 12 months, he suffers cancellation of the agreement and the denial of another until all liquidated damages have been paid in full. * * *" Id.

The *Isbrandtsen* decision prompted quick congressional reaction. Almost immediately after the decision, moratorium or interim legislation was passed to neutralize the Court's decision by preserving the legality of the dual rate contracts until such time as Congress could enact permanent legislation.[7] Such legislation was, in fact, enacted in 1961 in the form of P.L. 87–346, 75 Stat. 762, which, *inter alia*, added section 14b to the Shipping Act.

In its decision in the instant case, the Commission noted the interrelation between the *Isbrandtsen* decision and the passage of section 14b and explained the relevance of these events to the question involved in this case in these words:

> "A simple reading of the provisions of 14b makes it patently clear the contract which was to be legal under the Shipping Act 'notwithstanding any other provision of [the] Act,' was the dual rate contract before the Supreme Court in *Isbrandtsen*. But what of that contract which the Supreme Court had found to be something distinct and different from the dual rate contract—

---

7. Pub.L. 85–626, 85th Cong., S. 2916, 72 Stat. 574 (Aug. 12, 1958), amended by Pub.L. 86–542, 86th Cong., H.R. 10840, 74 Stat. 253 (June 29, 1960), further amended by Pub.L. 87–75, 87th Cong., H.R. 32154, 75 Stat. 195 (June 30, 1961).

the contract of which Congress expressly stated its awareness of but did not outlaw—the contract which the Supreme Court found similar to ordinary requirements contracts. Such contracts had, since 1916, been lawful under section 14 Fourth so long as they were not unfair or unjustly discriminatory. We will not now read section 14b as altering the long-standing status of these contracts." (Footnotes omitted.)

Finally with respect to section 14b, the Commission held that its determination of the lawfulness of the competitive bidding system under RFP 100 was in no way concerned with any special status of the Government as a shipper under the Act. Thus, it found petitioners' references to the legislative history concerning the removal of the exemption for Government property to be inapposite to its determination that RFP 100 was not a dual rate contract. The Commission, on the basis of the legislative history and administrative practice, concluded that the terms "shipper" and "consignee" as used in section 14b have a distinct and somewhat limited frame of reference—that of commercial enterprise—and it concluded that every shipper and consignee in foreign commerce is not necessarily a shipper or consignee within the meaning of section 14b. Thus, the Commission, in effect, held that a shipper implementing a competitive bidding program such as that utilized by MSTS would not be a shipper within the meaning of section 14b (because no section 14b dual rate contract would be formed) and thus would not be required to file its contracts with the Commission pursuant to section 14b.

In response to petitioners' challenges under the first paragraph of section 16, the Commission held that it would not be an unfair "device or means" under this section for competing carriers to keep secret from each other their bids on the MSTS' cargo. The Commission pointed out that under RFP 100 the rates agreed upon by MSTS and the shipper would subsequently be filed with the Commission, at which times such rates would be available to the public—both shipper and carrier alike. The Commission noted that if the bids were not kept secret until acted upon, there would be no advantage to the competitive bidding program. Finally, the Commission concluded that the practice under RFP 100 did not in any manner resemble past practices outlawed under the first paragraph of section 16, since such practices typically involved attempts by shippers to obtain transportation at less than tariff rates in effect at the time of shipment and RFP 100 did not bring about such a result.

III.

In order to resolve the difficult issues posed in this case resort must be had to the legislative history of the 1961 amendments to the Shipping Act to determine if, in fact, Congress intended that contracts such as those involved here should come within section 14b. As noted in the Commission's decision, this legislation was a direct result of, and reaction to, the 1958 *Isbrandtsen* decision. It is a fair appraisal of that decision to state that it reflected the application by the Court of antitrust principles to the theretofore legislatively authorized monopolistic shipping industry. In spite of the fact that the Isbrandtsen line, then acting as an independent, nonconference carrier, was creating havoc in the industry by its rate-cutting activities, the Court held that conference carriers could not "tie" shippers to the conference through restrictive dual rate contracts, because this would have the effect of stifling the competition of independents.

The legislative reaction by Congress largely reflected the reaction of the shipping industry. That reaction was that the abolition of dual rate contracts would mean the destruction of the conference system, would create cut-throat competition, and ultimately would bring about the demise of the American merchant marine since, unprotected, it could not compete with lower-cost foreign lines.

During the period intervening between the *Isbrandtsen* decision and the 1961 enactment of section 14b, parallel hearings on the shipping industry were held in the House of Representatives. In the House Merchant Marine and Fisheries Committee, extensive hearings were conducted, the principal concern of which was how to best legalize dual rate contracts. See generally, H.R.Rep. 498, 87th Cong., 1st Sess. (1961). The committee Report concluded that concerted activities among the carriers (through conferences) were necessary to the well-being of the United States foreign commerce. The committee was told that application of the antitrust principles reflected in the Supreme Court's *Isbrandtsen* decision would destroy the United States merchant marine. Dual rate contracts were seen as absolutely necessary to the orderly operation of the merchant marine in foreign commerce. Moreover, even though dual rate contracts tied the shipper to a conference and limited his choice of carriers, advantages were seen accruing to shippers through certainty of rates, service, and scheduling, which the conference carriers could offer as a result of the security derived from the commitment of the shippers.

Almost contemporaneously with these hearings, the Antitrust Subcommittee of the Committee on the Judiciary initiated an exhaustive investigation and held comprehensive hearings on monopoly problems in the steamship industry. These hearings brought out the fact of numerous unreported and unpoliced violations of the Shipping Act, and numerous abuses were found to exist under the dual rate system. See H.R.Rep. 498, 87th Cong., 1st Sess. (1961); S.Rep. 842, 87th Cong., 1st Sess. (1961). The Bill which was finally passed in the House reflected the fundamental conflict in approach to the regulation of the industry pursued and adopted by the two committees. On the one hand, the proposed section 14b sought to legalize dual rate contracts by authorizing shippers, carriers, and conferences to enter into such contracts so long as the contracts met the specific requirements enunciated in section 14b and so long as such contracts were filed with the Commission. On the other hand, the proposed legislation also contained several other provisions reflecting the antitrust approach of the Antitrust Subcommittee which were directly antithetical to the use of dual rate contracts and the maintenance of the conference system.

A large part of the Senate hearings was taken up with attempting to reconcile the divergent and almost contradictory provisions in the House Bill. The Bill as finally reported and passed represented largely a triumph for the conference interests in that most of the antitrust aspects of the legislation were deleted and dual rate contracts were legalized.

IV.

We have set out the foregoing in order to fashion a backdrop against which analysis of the specific provisions of section 14b as they apply to this case can be made. Since most of the legislative time was spent reconciling the two divergent approaches to regulation of the shipping industry, little attention was given to the specific constituent elements of dual rate contracts. This is not surprising because there seemed general agreement among all concerned as to the nature and definition of these contracts. For example, Senator Kefauver offered the following definition in the Senate debates:

"What is a dual-rate contract? Essentially, it is an exclusive patronage contract whereby a shipper—or consignee—promises to transport all of the cargo under his control, between ports, within the scope of a steamship conference agreement, aboard vessels belonging to that conference. Shippers who do not sign such an agreement are assessed a rate, called the noncontract rate, substantially above the so-called contract rate which is available to signatories. In its most elemental terms, the dual-rate contract is nothing but an exclusive dealing arrangement in which signatory shippers

are given preferential treatment while those unwilling to be bound are penalized by higher rates." *Index to Legislative History of the Steamship Conference, Dual Rate Law,* p. 292. (Compare *Id.* at 248.)

The discussion of witnesses and Congressmen during the hearings reflected the general nature of the competing concerns of both shippers and carriers with respect to dual rate contracts. Generally, this concern was reflected from the shipper's point of view in his willingness to enter into tying contracts, but only if assured that the tying provisions were fair and reasonable. The carrier and conference interests, on the other hand, were concerned with the preservation of the conference system, desiring to see it strengthened by legalizing dual rate contracts in such a manner that shipper and conference would largely be free to negotiate the terms of the tying contracts by themselves.

■ Our review of the legislative history makes it manifest to us that the contracts entered into under RFP 100 are not dual rate contracts required to be filed under section 14b, but rather that they are volume contracts subject to section 14 Fourth. The following considerations have led us to this conclusion:

1. The precise question posed in this case, *id est,* whether contracts formed between shipper and carrier as a result of competitive bidding practices implemented by the shipper are dual rate contracts under section 14b was never even remotely considered in the hearings. All of the discussion of dual rate contracts in the hearings and debates was addressed to carriers and conferences eliciting such contracts from shippers. No one was concerned with the possibility of a *shipper* seeking shipping contracts through competitive bidding. Thus, section 14b does not, either in its actual terms or in its history, refer to the eliciting of such contracts by shippers.

2. The legislative history supports the Commission's conclusion that "fixed portion" as used in section 14b refers to a

fixed "percentage" of a shipper's cargo and does not refer to a volume commitment on the part of a shipper such as is present under RFP 100. This fact is seen, for example, in a question by Senator Engle (chief Senate sponsor of the bill) to a witness concerning the precise phraseology to be used in section 14b. The Bill which was passed by the House spoke in terms of a contract committing "all or any part" of a shipper's patronage. Witnesses before the Senate questioned the advisability of use of the words "or any part." Thus Senator Engle queried an industry witness:

> "Would we be in better shape if we eliminated the ambiguity that might result from saying all or any part— should there be any specific percentage in there of some sort, or would you just take out the words or any part?" *Hearings Before the Merchant Marine and Fisheries Subcommittee of the Committee on Commerce,* 87th Cong., 1st Sess., p. 502 (1961).

The language in the Bill was subsequently changed from any "part" to "fixed portion" *(Id.* at 604), and discussions concerning the change in phraseology made it clear that fixed portion was to mean a fixed percentage. (See, *e. g., Id.* at 717.) This attitude was also reflected in the House hearings. For example, one witness stated that:

> "[W]e believe that the statute should make clear that it is intended to cover not only an exclusive patronage arrangement but also any arrangement involving any specific portion of the shipper's patronage.
>
> "What we have in mind in this connection is that instead of exclusive patronage there might be a situation requiring the shipper to give 80 or 90 percent of his cargo to a particular carrier or conference. The same statutory provisions should apply to such a situation as to a 100 percent patronage arrangement." *Hearings Before the Special Subcommittee on Steamship Conferences of the House Committee on Merchant Marine and Fisheries,*

87th Cong., 1st Sess., p. 389 (1961). See also similar comment at page 398.

◼ Thus, a dual rate contract governed by section 14b is one in which a shipper obtains a lower rate because he commits all of a fixed portion (percentage) of his cargo to a carrier or conference. A dual rate contract is not involved where an agreement between shipper and carrier (a) provides a discount for volume from the higher rate applicable without regard to volume and (b) embodies an undertaking by the shipper to tender, and by the carrier to transport, the minimum volume that triggers the low rate.

◼ If the particular rate discount or other inducement based on volume of freight is such as to make the contract "unfair or unjustly discriminatory," the contract would violate section 14 Fourth and would be subject to condemnation by the Commission but as the Commission pointed out—this would be dependent upon such things as the particular amount of cargo committed and the specific rate fixed under it. The volume discount from an open end rate is not inherently and necessarily unlawful.

The contract formed under RFP 100 is very similar to the requirements contract which the Supreme Court recognized in *Isbrandtsen* as being legal and which was not affected by section 14b. Thus, under a RFP 100 Cargo Commitment, MSTS obligates itself to furnish a specified volume of cargo per sailing for a fixed number of sailings. In return for this minimum volume of cargo, the bidding line provides a lower rate and guarantees enough space on each sailing to handle the agreed minimum amount of cargo. Default by either party results in the payment of damages under the contract. Consideration of the contract formulated under RFP 100 leads us to the conclusion that the contract formed is precisely that kind of contract which the Supreme Court in *Isbrandtsen* found similar to an ordinary requirements contract and lawful under the Shipping Act. As pointed out by counsel for the Commission:

"The Cargo Commitment obligates the carrier to furnish steamers (a specified amount of space) at regular intervals (by sailing) and at rates effective for a reasonably long period, sometimes a year (the specified period in the Cargo Commitment is one year). Moreover the Cargo Commitment is even more like a volume contract than the requirements contract in *Isbrandtsen* since Cargo Commitment is sought only if the bidding line feels that the guarantee of a minimum volume or amount of cargo per sailing is necessary to afford MSTS the lowest possible rate. Further, unlike a dual rate contract, rates under a Cargo Commitment are intended to bear a direct relationship to the specific amount of cargo offered under the contract." Br. for Commission, pp. 9–10. (Footnote omitted.)

No mention is made in either the language of section 14b or its legislative history, or section 14 Fourth, of the contracts for volume discount which are lawful thereunder, unless unfair or unjustly discriminatory.

◼ The essence of section 14b is, simply, that it is a permissive statute, not a prohibitory one. It says that the Commission shall by order "permit the use" of certain contracts notwithstanding the fact that other sections of the Act would otherwise prohibit them, *id est*, section 14 Third (as interpreted in *Isbrandtsen*). It does not render unlawful contracts for volume discounts that are not unfair or unjustly discriminatory and which are hence lawful under the congressional provision in section 14 Fourth pertaining to benefits based on volume.

We agree with the Commission that the Cargo Commitment is a contract based upon volume of freight offered and is subject to the requirements of section 14 Fourth and not section 14b. Congress evidenced no intent to read section 14 Fourth out of the Act by enacting section 14b, and we will certainly not infer such an intention from the mere enacting of section 14b.

## V.

█ We have dealt in the course of the foregoing with most of the arguments made by petitioners. Two remaining contentions deserve comment. We do not find weighty petitioners' argument that since Congress denied special status to the Government as a shipper, the Government cannot be allowed to secure better rates through competitive bidding resulting in the formulation of volume contracts. The Commission's decision makes it clear that its determination that the RFP 100 Cargo Commitments are not dual rate contracts is in no way dependent upon any special status of the Government as a shipper.

The remaining challenge to be dealt with under section 14b relates to petitioners' argument that, if the Government's power to utilize competitive bidding is in no way dependent upon its special status under the Act, every other shipper will be able to utilize such a system, with the end result that rate wars will develop and the conference system will be destroyed.

█ The Commission, as an expert administrative agency, has told us that the fearful results foretold by the conferences will not come about. We respect this judgment grounded in administrative expertise, as we must, Consolo v. Federal Maritime Commission, 383 U.S. 607, 621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966). We have no basis for saying that the Commission is wrong when it concludes that the evils foreseen by the conferences exist, if at all, only in the abstract and that they will not come about in the practical implementation of the RFP 100 program. On this premise we are confronted only with hobgoblins conjured up by an industry that is subsidized yet seeks to avoid the impact of effective competitive bidding.

We think it only proper to reiterate, however, that the affirmance of the Commission's order declaring the general legality of the new procurement system does not deny the Commission's power to deal with specific developments under section 14 Fourth or conceivably section 18(b) (5), or any of the other sections initially invoked by the conferences. It seems reasonable to suppose that if there are noxious outgrowths of the competitive procurement system these will be promptly called to the attention of Congress, which can take the action necessary to protect the legitimate interests of the maritime industry if the Commission is unable or unwilling to do so.

Putting such considerations aside, the judicial responsibility is to interpret the statute as it stands and to determine if the interpretation made by the Commission violates the will of Congress. Our independent interpretation and review lead us to agree with the Commission that the contracts entered into pursuant to RFP 100 are not dual rate contracts governed by section 14b, but rather, that they are lawful volume contracts under section 14 Fourth and consequently are not required to be filed with the Commission.

## VI.

We turn finally to petitioners' contention that the competitive bidding requirements established by RFP 100 are unjust or unfair devices or means within the meaning of the first paragraph of section 16. This paragraph provides:

"It shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person, or any officer, agent, or employee thereof, knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water for property at less than the rates or charges which would otherwise be applicable." 46 U.S.C. § 815 (1958), as amended, (Supp. I, 1966).

In its decision, the Commission noted that "the basic purpose of section 16 is to insure adherence by a carrier to his publicly announced rates." In response

to petitioners' argument that RFP 100 required "concealment" of rates, which constituted an "unjust or unfair device or means" under section 16, the Commission replied:

"It is difficult to conceive of a greater misapplication of the first paragraph of section 16. Under the terms of RFP 100 the rates established must be filed with the Commission. They are then of course available to the public, both shipper and carrier alike. Admittedly, no one will know the rates before they are published, but it must be asked how else can there be competition among the bidders?"

■ The Commission then proceeded upon a detailed review of the legislative history of the first paragraph of section 16 and the cases which have been decided interpreting this provision. It would unduly lengthen an already over-long opinion to consider specifically each of these cases and to analyze the legislative history as it applies to this point. Suffice it to say that we have made an in-depth study of these authorities and the arguments of petitioners attempting to explain and distinguish them. We are satisfied on the basis of this review that the Commission's decision is proper and that the competitive bidding requirements of RFP 100 do not constitute "unjust device[s] or means" under the first paragraph of section 16.

For all of the foregoing reasons, therefore, the decision of the Commission is affirmed.

## APPENDIX

Section 14 of the Shipping Act, 1916 [8]

"No common carrier by water shall, directly or indirectly, in respect to the transportation by water of passengers or property between a port of a State, Territory, District, or possession of the United States and any other such port or a port of a foreign country—

"First. Pay or allow, or enter into any combination, agreement, or understanding, express or implied, to pay or allow a deferred rebate to any shipper. The term 'deferred rebate' in this Act means a return of any portion of the freight money by a carrier to any shipper as a consideration for the giving of all or any portion of his shipments to the same or any other carrier, or for any other purpose, the payment of which is deferred beyond the completion of the service for which it is paid, and is made only if, during both the period for which computed and the period of deferment, the shipper has complied with the terms of the rebate agreement or arrangement.

"Second. Use a fighting ship either separately or in conjunction with any other carrier, through agreement or otherwise. The term 'fighting ship' in this Act means a vessel used in a particular trade by a carrier or group of carriers for the purpose of excluding, preventing, or reducing competition by driving another carrier out of said trade.

"Third. Retaliate against any shipper by refusing, or threatening to refuse, space accommodations when such are available, or resort to other discriminating or unfair methods, because such shipper has patronized any other carrier or has filed a complaint charging unfair treatment, or for any other reason.

"Fourth. Make any unfair or unjustly discriminatory contract with any shipper based on the volume of freight offered, or unfairly treat or unjustly discriminate against any shipper in the matter of (a) cargo space accommodations or other facilities, due regard being had for the proper loading of the vessel and the available tonnage; (b) the loading and landing of freight in proper condition; or (c) the adjustment and settlement of claims.

"Any carrier who violates any provision of this section shall be guilty of a misdemeanor punishable by a fine of not

8. As amended. Pertinent parts reproduced here were enacted Oct. 3, 1961, Pub.L. 87–346, 75 Stat. 762.

more than $25,000 for each offense. *Provided,* That nothing in this section or elsewhere in this Act, shall be construed or applied to forbid or make unlawful any dual rate contract arrangement in use by the members of a conference on May 19, 1958, which conference is organized under an agreement approved under section 15 of this Act by the regulatory body administering this Act, unless and until such regulatory body disapproves, cancels, or modifies such arrangement in accordance with the standards set forth in section 15 of this Act. The term 'dual rate contract arrangement' as used herein means a practice whereby a conference establishes tariffs of rates at two levels the lower of which will be charged to merchants who agree to ship their cargoes on vessels of members of the conference only and the higher of which shall be charged to merchants who do not so agree." 46 U.S.C. § 812 (1958), as amended (Supp. I, 1966).

### Section 14b of the Shipping Act

"Notwithstanding any other provisions of this Act, on application the Federal Maritime Commission (hereinafter "Commission"), shall, after notice, and hearing, by order, permit the use by any common carrier or conference of such carriers in foreign commerce of any contract, amendment, or modification thereof, which is available to all shippers and consignees on equal terms and conditions, which provides lower rates to a shipper or consignee who agrees to give all or any fixed portion of his patronage to such carrier or conference of carriers unless the Commission finds that the contract, amendment, or modification thereof will be detrimental to the commerce of the United States or contrary to the public interest, or unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, and provided the contract, amendment, or modification thereof, expressly (1) permits prompt release of the contract shipper from the contract with respect to any shipment or shipments for which the contracting carrier or conference of carriers cannot provide as much space as the contract shipper shall require on reasonable notice; (2) provides that whenever a tariff rate for the carriage of goods under the contract becomes effective, insofar as it is under the control of the carrier or conference of carriers, it shall not be increased before a reasonable period, but in no case less than ninety days; (3) covers only those goods of the contract shipper as to the shipment of which he has the legal right at the time of shipment to select the carrier: *Provided, however,* That it shall be deemed a breach of the contract if, before the time of shipment and with the intent to avoid his obligation under the contract, the contract shipper divests himself, or with the same intent permits himself to be divested, of the legal right to select the carrier and the shipment is carried by a carrier which is not a party to the contract; (4) does not require the contract shipper to divert shipment of goods from natural routings not served by the carrier or conference of carriers where direct carriage is available; (5) limits damages recoverable for breach by either party to actual damages to be determined after breach in accordance with the principles of contract law: *Provided, however,* That the contract may specify that in the case of a breach by a contract shipper the damages may be an amount not exceeding the freight charges computed at the contract rate on the particular shipment, less the cost of handling; (6) permits the contract shipper to terminate at any time without penalty upon ninety days' notice; (7) provides for a spread between ordinary rates and rates charged contract shippers which the Commission finds to be reasonable in all the circumstances but which spread shall in no event be more than 15 per centum of the ordinary rates; (8) excludes cargo of the contract shippers which is loaded and carried in bulk without mark or count except liquid bulk cargoes, other than

chemicals, in less than full shipload lots: *Provided, however,* That upon finding that economic factors so warrant, the Commission may exclude from the contract any commodity subject to the foregoing exception; and (9) contains such other provisions not inconsistent herewith as the Commission shall require or permit. The Commission shall withdraw permission which it has granted under the authority contained in this section for the use of any contract if it finds, after notice and hearing, that the use of such contract is detrimental to the commerce of the United States or contrary to the public interest, or is unjustly discriminatory or unfair as between shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors. The carrier or conference of carriers may on ninety days' notice terminate without penalty the contract rate system herein authorized, in whole or with respect to any commodity: *Provided, however,* That after such termination the carrier or conference of carriers may not reinstitute such contract rate system or part thereof so terminated without prior permission by the Commission in accordance with the provisions of this section. Any contract, amendment, or modification of any contract not permitted by the Commission shall be unlawful, and contracts, amendments, and modifications shall be lawful only when and as long as permitted by the Commission; before permission is granted or after permission is withdrawn it shall be unlawful to carry out in whole or in part, directly or indirectly, any such contract, amendment, or modification. As used in this section, the term 'contract shipper' means a person other than a carrier or conference of carriers who is a party to a contract the use of which may be permitted under this section." 46 U.S.C. § 813a (1958), *as amended,* (Supp. I, 1966).

Section 16 of the Shipping Act

"It shall be unlawful for any shipper, consignor, consignee, forwarder, broker, or other person, or any officer, agent, or employee thereof, knowingly and willfully, directly or indirectly, by means of false billing, false classification, false weighing, false report of weight, or by any other unjust or unfair device or means to obtain or attempt to obtain transportation by water for property at less than the rates or charges which would otherwise be applicable.

"It shall be unlawful for any common carrier by water, or other person subject to this chapter, either alone or in conjunction with any other person, directly or indirectly—

"First. To make or give any undue or unreasonable preference or advantage to any particular person, locality, or description of traffic in any respect whatsoever, or to subject any particular person, locality, or description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: *Provided,* That within thirty days after enactment of this Act, or within thirty days after the effective date or the filing with the Commission, whichever is later, of any conference freight rate, rule, or regulation in the foreign commerce of the United States, the Governor of any State, Commonwealth, or possession of the United States may file a protest with the Commission upon the ground that the rate, rule, or regulation unjustly discriminates against that State, Commonwealth, or possession of the United States, in which case the Commission shall issue an order to the conference to show cause why the rate, rule, or regulation should not be set aside. Within one hundred and eighty days from the date of the issuance of such order, the Commission shall determine whether or not such rate, rule, or regulation is unjustly discriminatory and issue a final order either dismissing the protest, or setting aside the rate, rule, or regulation." 46 U.S.C. § 815 (1958), as amended (Supp. I, 1966).

"COMPETITIVE PROCUREMENT
(Ocean Transportation—Common
Carriage)

INSTRUCTIONS TO OFFERORS

\* \* \* \* \* \*

"2. *Alternate Offers:* Where a carrier requires a firm commitment by the Government to ship a minimum volume of cargo on each sailing in order to enable it to offer its best rates, or to establish service on a particular route, it may also offer one or more alternate proposals and prescribe such a minimum for each. Offers subject to shipment of a minimum of cargo will not be considered unless the carrier has also made an offer under an 'open-end' Shipping Agreement.

"3. It will be the goal of the Contracting Officer to obtain reasonable rates and ample service capability without making awards by which the Government is committed to ship a fixed volume of cargo on each sailing. The total of commitments for the Government to ship cargo will be kept at the lowest level at which the desired service can be obtained, considering rates and such features as frequency of sailing and types of ships.

"4. Offers which do not require the Government to be committed to ship a minimum amount of cargo will be considered first. Where lower rates or improved capability would be available by the acceptance of offers that require such a commitment, the Contracting Officer will examine the alternate offers of that type to determine what combination of both types of offers would result in the procurement being made to the best advantage of the Government, price and other factors considered. Where the ships and service covered by that combination required to obtain optimum rates appears likely to restrict the flexibility of the service on the route, the Contracting Officer will determine the level of the total of those commitments that permits the required flexibility."