**PEOPLES GAS, LIGHT AND COKE COMPANY, Plaintiff-Appellee,**

v.

**UNITED STATES POSTAL SERVICE; William F. Bolger, Postmaster General of the United States; John P. Doran, Regional Postmaster General, United States Postal Service; and E. P. Gailmard, Regional Director, Real Estate and Buildings Department, United States Postal Service, Defendants-Appellants.**

**No. 81–1366.**

United States Court of Appeals, Seventh Circuit.

Argued May 1, 1981.

Decided Aug. 18, 1981.

---

Dan K. Webb, U. S. Atty., Mary Anne Mason, Nancy K. Needles, Asst. U. S. Attys., Chicago, Ill., for defendants-appellants.

Thomas Campbell, Gardner, Carton & Douglas, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Senior Circuit Judge, PELL, Circuit Judge, and CAMPBELL,[1] Senior District Judge.

SWYGERT, Senior Circuit Judge.

This appeal requires us to determine whether procurement decisions of the United States Postal Service are subject to judicial review and, if so, whether the plaintiff had standing to challenge the decision involved in this case.

Defendants-appellants, the United States Postal Service, the Postmaster General of the United States, William F. Bolger, the Regional Postmaster General, John P. Do-

---

1. The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, is sitting by designation.

ran, and the Regional Director of the Real Estate and Buildings Department, E. P. Gailmard, appeal from a preliminary injunction granted on February 25, 1981 in favor of the Peoples Gas, Light and Coke Company, a Chicago-based public utility. Peoples Gas sought to enjoin the Postal Service from proceeding with an invitation for bids to construct an electrically-powered plant to heat the Chicago Main Post Office. In its complaint for injunctive and declaratory relief, Peoples Gas alleged injury by the Postal Service's failure to comply with the capital investment and contracting requirements of applicable postal regulations. The district court held a hearing in early February 1981 and shortly thereafter granted the preliminary injunction. Defendants' appeal followed.

The Chicago Main Post Office Building, one of the largest buildings in Chicago, has been heated since its construction in 1933 by steam purchased from the Chicago Union Station Company. The Union Station Company generates steam from natural gas purchased from Peoples Gas. In September 1979 the Union Station Company notified the Postal Service of its intention to cancel its steam contract as of September 30, 1982. Postal Service officials therefore commissioned the architectural and engineering firm of Perkins and Will to make an economic analysis and an environmental assessment of available heating sources. As the study progressed, various heating sources were considered, including solar heat, oil, and coal, but all were eliminated from serious consideration for a variety of reasons with the exception of a central high pressure gas plant and a central high pressure electric plant.

The Perkins and Will study concluded that gas was the economically superior alternative but rejected it because of the potential delay that could be caused by environmental considerations. Perkins and Will had been specifically instructed by postal officials that it was essential for the Service to have a replacement plant by September 1982, when its present steam heating contract would terminate. It was further understood that the scheduling requirements of the project would not allow enough time for the filing of an Environmental Impact Statement. Accordingly, the Perkins and Will study noted that although a gas burner plant would present negligible environmental impact, a variance would be required from the City of Chicago to reduce the height of the exhaust stack of a gas plant in order to minimize the possibility of an impact statement. Moreover, developers or residents in the vicinity of the plant might consider a high stack aesthetically unpleasant, or a source of high pollution, which might in turn require an impact statement. Since an electric boiler plant was the only alternative which presented no environmental or aesthetic problems, the Perkins and Will study recommended that an electric heating plant be constructed.[2]

The defendant Postal Service officials had reached the same conclusion that the more cost-effective gas heating plant alternative should be eliminated for environmental reasons at a meeting held on May 14–15, 1980, one month prior to the completion of the Perkins and Will study. The officials were concerned that there would be opposition from the City of Chicago or some other interested group on environmental grounds to a plant that would have smoke stack projections or emissions that could be perceived as pollutant. A Draft Decision Analysis Report, dated May 16, 1980, summarized the decision reached by Postal Service officials at the meeting in May and was later put into final form in the Decision Analysis Report issued on June 17, 1980. The final report presented the alternative of a gas fired boiler plant:

*Gas-Fired Boiler Plant*

2. According to the Perkins and Will study, the following factors were considered to favor electricity:
 1. Reduced Initial Costs
 2. Reduced Present Worth of 20-Year Discounted Operating Cost

3. No Environmental Problems or Delays
4. Greater Construction Scheduling Flexibility

This option would present a negligible environmental impact, according to the Perkins and Will engineering report; an aesthetic problem would exist with the height of the stack.

However, the City of Chicago has advised in a letter (dated May 13, 1980), that construction of a steam generating plant in the vicinity of Harrison and Canal Streets or at almost any other location in that vicinity, must be analyzed carefully in terms of environmental impacts, both actual and potential, attendant to such a facility. Also, the City states, any major projecting structure (such as a stack), and the potential impact on air quality from combustion of fossil fuels on site might collectively indicate a need for an environmental impact analysis.

Although construction of a gas-fired boiler is economically superior to an electric boiler over the analysis period, this alternative was eliminated due to the possibility that an Environmental Impact Statement would be required, and this action would delay the completion of the proposed plant beyond the September 1982 cut-off date for providing a replacement source of steam.

This analysis was based in part upon the mistaken assumption of Regional Director Gailmard, the contracting officer involved in the project, that an applicable Postal Service regulation required the filing of an Environmental Impact Statement whenever a proposed project could be considered environmentally controversial. When the decision was made in May to eliminate the gas alternative, Gailmard was unaware of the fact that the regulation which would have required an impact statement had been superseded six months earlier in November 1979. 39 C.F.R. § 775.4(4) (July 1977). Under the new regulation, if a site-planning environmental assessment indicates that a particular project poses no significant environmental impact, the responsible officials are required to issue a finding to that effect. Pursuant to the amended regulation, Gailmard should have issued a no-impact statement for gas after the Perkins and Will environmental assessment indicated that a gas heating plant would have only a negligible environmental impact.

The defendant Postal Service officials sent the final Decision Analysis Report to the Capital Investment Committee. The Capital Investment Commitee made some modifications to the report and then presented it, together with the Perkins and Will study, to the Board of Governors, an eleven member board consisting of nine presidential appointees, the Postmaster General, and the Deputy Postmaster General, for final approval of the capital investment proposal. The Board of Governors adopted the recommendations of the committee on August 5, 1980.

Following the decision of the Board of Governors, Peoples Gas was in constant contact through its representatives and correspondence with Postal Service officials regarding the selection of electricity over gas. Peoples Gas submitted its own estimate of annual operating costs for a gas heating plant to show that gas was substantially less costly than electricity. At one meeting on October 22, Postal Service representatives confirmed that Perkins and Will had on its own figures recalculated the initial annual fuel cost savings of gas to be over one million dollars as opposed to the $996,-500 calculated in its original report. Nonetheless, Postal Service officials repeatedly denied the requests of Peoples Gas for a copy of the Perkins and Will study and related documents. It was not until after those documents were dislodged by two Freedom of Information Act requests filed by Peoples Gas that it became clear to Peoples Gas that environmental considerations were the basis for the rejection of the gas fired alternative. To counter the environmental concerns, Peoples Gas submitted a letter to defendant Regional Postmaster General Doran, dated November 17, 1980, from the City of Chicago, indicating that the city would look favorably upon a request for a variance from the stack height requirement. Peoples Gas sought to demonstrate through subsequent correspondence with Postal Service officials, including the United States Postmaster General

Bolger, and during a meeting with Assistant Postmaster General Craig on December 5, 1980, that the Perkins and Will study greatly underestimated the cost advantage of the gas alternative and was mistaken on environmental factors as well.

Meanwhile, on November 21, 1980, the Postal Service issued an invitation for bids for the construction of a steam boiler plant powered by electricity. On December 29, 1980, Peoples Gas filed a protest against the invitation for bids under the Postal Contracting Manual, which governs the Postal Service procurement decisions. The bid opening was delayed by the Postal Service two weeks until January 20, 1981, in order to allow the Office of the General Counsel an opportunity to respond to the protest. The General Counsel's response was issued on February 4, 1981, and addressed each of the claims raised by Peoples Gas. The plaintiff filed its complaint in the district court on January 12, 1981, alleging the same violations of the Postal Contracting Manual and the two internally-promulgated Capital Investment Implementation Instructions, Publications Nos. 190 and 191, as were alleged in its bid protest.

During the course of the hearing on plaintiff's motion for preliminary injunction in the district court, Peoples Gas representatives testified regarding the variances between their studies of fuel and construction costs and those of Perkins and Will. The district court specifically noted in its memorandum opinion that Gailmard's decision to disqualify the gas alternative on environmental grounds was based on a prior Postal Service regulation on Environmental Assessment and Impact Statement Procedures that had been recently superseded. This error, in the court's view, fatally infected the entire decisional process running all the way up through the Postal Service chain of command, causing the final decision by the Board of Governors to be based on a flawed analysis of the alternatives. Observing that under Publication No. 191, § 3.14, usually the most effective capital investment proposal is chosen unless the alternative is fully justified, the court added: "We cannot *presume* that the Board of Governors would have viewed the selection of electricity as 'fully justified' if the presentation given was that gas was economically superior and that USPS would *not* require an Environmental Impact Statement for *either* gas or electricity." The district court further noted specific errors contained in the Perkins and Will study and identified matters which should be taken into consideration by the Postal Service during a reevaluation of its decision. The court enjoined the Postal Service from awarding a contract under the invitation for bids by memorandum opinion dated February 19, 1981 and order entered on February 25, 1981. The defendants were directed to make a prompt reevaluation of the project's comparative economics using applicable Department of Energy escalation rates and to make a finding of negative environmental impact for both gas and electricity to be transmitted through appropriate administrative procedures for final decision of the Board of Governors. This appeal followed. We reverse.

I

Our first consideration is subject matter jurisdiction which, in the context of this case, requires a determination of whether the district court had authority to review the procurement decision that was made by the Postal Service. Following our discussion of subject matter jurisdiction, we will consider whether Peoples Gas had standing to bring this action.[3]

---

**3.** However we choose to term it—subject matter jurisdiction or reviewability—a determination of whether the district court had authority to entertain plaintiffs' claim should precede the question of plaintiffs' standing to bring the suit. Even though a particular plaintiff lacks standing, some person or entity may have standing to challenge a Postal Service procurement deci-

sion were it decided that judicial reviewability exists. Conversely, nonreviewability would mean that the matter of standing becomes inconsequential.

Although logic seems to require this ordering of the issues, it can be argued with almost equal logic that the question of standing should precede a determination of subject matter jur-

 The district court, 508 F.Supp. 808, found subject matter jurisdiction in two statutes: (1) 28 U.S.C. § 1339 ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to the Postal Service.") and (2) 39 U.S.C. § 409(a) ("Except as provided in section 3628 of this title [inapplicable in this case], the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service."). We hold that neither statute provides an independent basis for jurisdiction. To each of these provisions there must be added a substantive legal framework to afford subject matter jurisdiction. It is our view that these two statutes serve to remove any barrier that might otherwise exist by reason of the doctrine of sovereign immunity. They permit the Postal Service, an independent executive establishment created by Congress, to sue and to be sued. As such they form no basis for a cause of action.

The district court cited *National Assoc. of Postal Sup'rs v. United States Postal Service*, 602 F.2d 420 (D.C.Cir.1979), as support for its holding. In that case three associations of postal service supervisory personnel filed an action against the Postal Service, alleging that its denial of future cost of living raises and reduction of salary differentials violated section 1004(a, b) of the Postal Reorganization Act, 39 U.S.C. § 1004(a, b). Although in that case Judge

MacKinnon expressly acknowledged that 28 U.S.C. § 1339 provided a basis for entertaining the action, it is clear from his opinion that section 1004(a, b) provided the substantive law upon which the case was decided. That provision thus served as the essential predicate for the cause of action asserted therein. Accordingly, *National Assoc. of Postal Sup'rs* does not support the district court's holding.

 We agree with the United States that the Postal Reorganization Act contains no provision which governs the manner by which the Postal Service may enter into procurement contracts. But that does not end our inquiry into whether a substantive basis exists for jurisdiction. Section 401(3) of the Act, 39 U.S.C. §§ 101 *et seq.*, gives the Postal Service general powers "to enter into and perform contracts ... and determine the character of, and necessity for, its expenditures" and section 401(2) authorizes the Postal Service "to adopt ... such rules and regulations as it deems necessary to accomplish the objectives of this title." Thus it is clear that these two provisions of section 401 do authorize the Postal Service to make rules and regulations pertaining to its procurement needs. Pursuant to its statutory authority, the Postal Service has promulgated the Postal Contracting Manual and Publications Nos. 190 and 191. Whereas the plaintiff refers generally to these Postal Service regulations as being relevant to its claim, only one specific regulation was

isdiction. For if a plaintiff lacks standing, any discussion of subject matter jurisdiction/reviewability becomes dictum. That conceptual difficulty exists in this area has been noted by at least one commentator:

Standing has been labeled one of the most amorphous concepts in the domain of public law, and has been referred to as a "complicated specialty of federal jurisdiction," and criticized as being both "needlessly complex and needlessly artificial." Moreover, standing is but one aspect of "justiciability" which "is itself a concept of uncertain meaning and scope." Justiciability embraces ripeness, mootness, the policy against collusive suits, the policy against rendering advisory opinions, and the self-imposed requirement that courts avoid issues that intrude into areas committed to other branches of government. The term "justiciability" has also been used

interchangeably with the term "reviewability" and includes such features as subject matter jurisdiction, whether a cause of action has been stated, and whether judicial review has otherwise been foreclosed. Taken together, the concepts of justiciability and reviewability represent the myriad hurdles, of which standing is but one, a plaintiff is required to overcome in order to get his day in court. Overlap between problems of standing and other problems of reviewability are quite common, and "[t]oo often these various questions have been merged into one confused inquiry, lumped under the general rubric of "standing."

J. Grossbaum, *Procedural Fairness in Public Contracts: The Procurement Regulations*, 57 Va.L.Rev. 171, 227–28 (1971) (footnotes omitted).

expressly relied upon by the district court to establish a violation: Section 3.14 of Publication No. 191, Capital Investment Implementation Instructions, which states, "Usually the most cost effective solution that meets capacity and environmental standards is selected. Other alternatives recommended or selected in lieu of the most cost effective one must be fully justified." Unquestionably this provision sets forth a cost effective standard that the Postal Service must apply in making procurement decisions. Consequently, there is a law to apply in this review action, contrary to the defendants' suggestion, and a substantive basis for jurisdiction.

■ The United States concedes, as it must, that a validly-issued regulation may provide an independent basis for jurisdiction. *Goldman v. First Federal Savings and Loan Assoc. of Wilmette*, 518 F.2d 1247 (7th Cir. 1975). The United States, however, urges that once the foundation is laid by a validly-enacted regulation under a general empowering statute, we must further inquire into whether the regulation affords a private right of action enforceable in a federal court. In that regard the United States points to the absence of any specific language in the Postal Reorganization Act which can be read as creating a right of review. Additionally, the defendants note that the plaintiff has not shown how Publications Nos. 190 and 191 create an enforceable private right of action or cited legislative history indicative of congressional intent to create a right of review.

■ In this inquiry we are guided by the principle that nonreviewability of administrative actions taken pursuant to a statute or regulation is "not lightly to be inferred." *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192 (1970). "Indeed, judicial review of such administrative action is the rule, and nonreviewability

an exception which must be demonstrated." *Ibid.* The Supreme Court has repeatedly emphasized that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Laboratories v. Garder*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), quoting *Rusk v. Cort*, 369 U.S. 367, 379, 380, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962). *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971). Of course, a clear statutory command will preclude review, *Barlow v. Collins, supra*, but where the relevant statute, such as the Postal Reorganization Act here, does not contain an express prohibition, it is the party asserting nonreviewability that has "the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review." *Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1974). Thus it has been said that, "The question is phrased in terms of 'prohibition' rather than 'authorization' because a survey of our cases shows that judicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." *Abbott Laboratories v. Garder*, 387 U.S. at 140, 87 S.Ct. at 1511; *see Dunlop v. Bachowski*, 421 U.S. at 560, 95 S.Ct. at 1854. The foregoing decisions make clear that, contrary to the position taken by the United States Attorney, it is incumbent upon the United States to demonstrate that Congress intended to preclude judicial review and not for the plaintiff to demonstrate that judicial review was authorized under the relevant regulatory scheme.[4]

■ In the absence of a clear statutory command, congressional intent to preclude judicial review may be shown by the

---

4. With regard to the United States' contention concerning the absence of statutory language authorizing review, it is evident that the Postal Reorganization Act and the regulations promulgated thereunder are silent on the question of review. We adopt the view of one commentator that the general presumption in favor of

review probably serves to negate an assumption that statutory silence is an indication that no review is intended. *See* H. Saferstein, *Nonreviewability: A Functional Analysis of "Committed to Agency Discretion"*, 82 Harv.L.Rev. 367, 379 (1968), citing *Abbott Laboratories v. Garder, supra.*

overall purpose or design of the relevant statute as viewed within the context of the entire legislative scheme. *Abbott Laboratories v. Garder*, 387 U.S. at 141, 87 S.Ct. at 1511. As the Supreme Court observed in *Assoc. of Data Processing Service Org. v. Camp*, 397 U.S. 150, 157, 90 S.Ct. 827, 832, 25 L.Ed.2d 184 (1970), there is a presumption in favor of judicial review "unless a contrary purpose is fairly discernible in the statutory scheme." Various standards have been employed in determining whether agency action is nonreviewable. A recent pronouncement in *National Assoc. of Postal Sup'rs v. United States Postal Service, supra*, offered the following factors for consideration: "A judicial determination of Congressional intent, the functional needs of the agency for flexibility and discretion, and the capacity of the courts to resolve issues presented to them." 602 F.2d at 429.

▮▮▮▮▮ The United States contends that a congressional intent to preclude review can be inferred from the fact that Congress exempted the Postal Service from all federal law dealing with public or federal contracts, as well as the Administrative Procedure Act. The Administrative Procedure Act has been widely interpreted as being merely declaratory of the common law of reviewability and standing existing at the time of the statute's enactment in 1948. *See, e. g., Arnold Tours, Inc. v. Camp*, 408 F.2d 1147, 1161 (1st Cir. 1969), *vacated*, 397 U.S. 315, 90 S.Ct. 1109, 25 L.Ed.2d 333 (1970); *Kansas City Power & Light Co. v. McKay*, 225 F.2d 924, 931–32 (D.C.Cir.), *cert. denied*, 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955). *Contra, e. g., Scanwell Labs, Inc. v. Schaeffer*, 424 F.2d 859, 872 (D.C.Cir.1970). *See generally*, 6 Jaffe, *Judi-*

*cial Control of Administrative Action*, at 372, 528–30 (1965) (hereinafter cited as "Jaffe, at . . . . . ."). As such, the Administrative Procedure Act embodies the basic common law presumption of judicial review. *Abbott Labs, Inc.*, 387 U.S. at 140, 87 S.Ct. at 1511, citing *Shields v. Utah Idaho Central RR*, 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111 (1938); *Stark v. Wickard*, 321 U.S. 288, 64 S.Ct. 559, 88 L.Ed. 733 (1944); *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108, 23 S.Ct. 33, 38, 47 L.Ed. 90 (1902); Jaffe, at 372; H. Saferstein, *supra* n. 4, at 374. It can be reasonably assumed, therefore, that an agency's exemption from the provisions of the Administrative Procedure Act does not negate the applicability of common law review principles that preexisted and operate apart from the subsequent codification. The exemption of the Postal Service from all federal law dealing with public or federal contracts pertains only to the independent nature of the operations of the Postal Service under the Postal Service Reorganization Act. However, this general exemption does not reach the governmental limitations contained in the Postal Service's own regulations. We conclude that the exemptions found in section 410 of the Postal Reorganization Act do not manifest a congressional intent to foreclose all judicial review of alleged violations by the Postal Service's procurement regulations.[5]

▮▮▮▮▮ This suit does not challenge the manner in which the Postal Service attempted to enter into a contract for heating services, but rather the manner in which the Postal Service reached its decision to specify an electrically-powered heating fa-

5. At least two courts have explicitly applied the common law presumption of reviewability in actions brought against the Postal Service under the Postal Reorganization Act: *National Assoc. of Postal Sup'rs, supra*; and *Burns v. United States Postal Service*, 380 F.2d 623, 626 (S.D.N.Y.1974) (an action decided under 39 U.S.C. § 409(a) and 39 U.S.C. § 1005(f), relating to labor laws and policies applicable to the Postal Service). The *Burns* court expressly noted that, "the fact that the Administrative Procedure Act is not applicable, however, does not indicate a Congressional desire to foreclose judicial review of this action, such as the classification of compensation and benefits." Similarly, in *NAACP v. United States Postal Service*, 398 F.Supp. 562 (N.D.Ga.1975), the court found that although the exemption from the grant of jurisdiction in 39 U.S.C. § 409 is somewhat limited by the Administrative Procedure Act, the prohibitions contained in that section do not prevent adjudication of an alleged constitutional violation and a violation of the public hearing requirements under 39 U.S.C. § 3661 of the Postal Reorganization Act.

cility for the Chicago Main Post Office. As previously noted, the Postal Service's discretion to make that decision was not unbounded but was subject to certain guidelines contained in its regulations, in particular Publication No. 191. An exercise of discretion is presumptively reviewable for legal error, procedural defect, or abuse. It goes without saying that the Postal Service may not act in contravention of the legal restrictions contained in its governing regulations. *Scanwell Laboratories, Inc. v. Schaeffer*, 424 F.2d at 874. The court observed in that case that "contracting officials can exercise discretion upon a broad range of issues confronting them; they may not, however, opt to act illegally. When the bounds of discretion give way to the stricter boundaries of law, administrative discretion gives way to judicial review."

We hold that the presumption of reviewability has not been rebutted and that the jurisdiction of a district court may be invoked to test the validity of a procurement decision made by the Postal Service pursuant to its regulations.

## II

■ The district court held that Peoples Gas had standing to bring this action. The court reasoned that it would make no sense, conceptually or practically, to recognize standing for a bidder on a construction contract, but not for Peoples Gas as the assured supplier of gas if the Postal Service

reversed its decision on the kind of heating system to be constructed, citing *Airco, Inc. v. Energy Research and Development Administration*, 528 F.2d 1294, 1296 (7th Cir. 1975), and *Rossetti Contracting Co., Inc. v. Brennan*, 508 F.2d 1039, 1042 (7th Cir. 1974).[6] Furthermore, the court said that, "Once as here a plaintiff has demonstrated the potential 'injury in fact' necessary to confer such standing, that plaintiff can *also* assert the *public* interest in support of its own claim," citing *Sierra Club v. Morton*, 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972) (emphasis in original). Finally, the court found that this case fits comfortably within the basic standing principles most recently confirmed in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

■ It should be noted, however, that one of the standing principles confirmed by the Supreme Court in *Gladstone* which was not considered by the district court when it recognized standing for the plaintiff in this action was noted by the Supreme Court in *Gladstone*:

There are other nonconstitutional limitations on standing to be applied in appropriate circumstances. *See, e. g., Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1976) ("the interest of the plaintiff, regardless of its nature in the absolute, [must] at least be

6. In a footnote the court added that whereas these cases were decided under the Administrative Procedure Act, the principles expressed in *National Assoc. of Postal Sup'rs v. United States Postal Service*, 602 F.2d 420 (D.C.Cir. 1979), and *Burns v. United States Postal Service*, 380 F.Supp. 623 (S.D.N.Y.1974), and a similar line of cases discussed in that opinion, would confer standing on a disappointed bidder. We fail to see how the principles discussed in *National Assoc. of Postal Sup'rs* and *Burns* would confer standing on a bidder or, as in the present context, on a monopoly supplier. In neither of those cases was the issue of standing raised or discussed, but rather those cases dealt with questions concerning reviewability and the proper scope of review. *See* discussion, *supra*, n. 5. Granted that, as one commentator has noted, if the class of persons most nearly affected does not have standing,

the administrative action is for all practical purposes not subject to judicial review. *See* Jaffe, at 336, 337, cited in *Morgan Associates v. United States Postal Service*, 387 F.Supp. 947, 949, *aff'd on other grounds*, 511 F.2d 1223 (2d Cir. 1975). However, this does not make the converse proposition necessarily true, as the district court seems to suggest by its reliance on the *National Assoc. of Postal Sup'rs* and *Burns* cases. Administrative action which is determined to be reviewable does not automatically confer standing upon the class of persons most nearly affected because there is a strong presumption in favor of judicial review of administrative action. This does not aid persons seeking standing. Once reviewability *vel non* is established, such persons have the burden of overcoming the constitutional and prudential limitations on the court's jurisdiction that have been developed in the area of standing.

'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises." Quoting *Data Processing Serv. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1969)).

*Gladstone, supra*, 441 U.S. at 100, n. 6, 99 S.Ct. at 1608 n. 6. The district court did not consider whether Peoples Gas's claim was arguably within the zone of interest to be protected or regulated by the statutory framework within which the complaint arose. We recently observed in *Marshall and Ilsley Corporation v. Heimann*, 652 F.2d 685 at 693 (7th Cir. 1981) that this circuit has consistently required satisfaction of the zone of interest test for standing.[7] As more fully discussed below, we see no reason to depart from this requirement in the instant case.

 Although we recognize at the outset that "[g]eneralizations about standing to sue are largely worthless as such" (*Data Processing Service v. Camp*, 397 U.S.

150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1979)), a consensus has formed around certain generalizations about standing that serves to provide a doctrinal framework from which an analysis of standing may proceed. Whenever standing is placed in issue, the question is raised whether the person whose standing is challenged is the proper party to request an adjudication of a particular issue. *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). "This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. . . . In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). In its constitutional dimension, the inquiry is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness" which warrants the plaintiff's

---

**7.** This statement is not altogether correct. In at least two Seventh Circuit cases, *Airco, Inc. v. Energy Research & Development Administration*, 528 F.2d 1294, 1296 (7th Cir. 1975), and *Rossetti Contracting Co., Inc. v. Brennan*, 508 F.2d 1039, 1042 (7th Cir. 1974), both cited by the district court as being analogous to the present case, the zone test was not explicitly applied. *Airco* summarily found standing for a disappointed bidder under the Administrative Procedure Act, 5 U.S.C. § 702, stating that "We see no need to reconsider the standing issue at this time." We there observed that other circuits have agreed that disappointed bidders have standing, and we relied upon *Rossetti* although we specifically noted that the standing issue was not briefed or argued in that case. *Rossetti* considered the merits of a disappointed bidder's challenge to a procurement decision on the rationale that, "the Administrative Procedure Act, 5 U.S.C. § 702, provides a basis for such consideration," citing *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 872 (D.C.Cir. 1970). Thus *Rossetti* did not address the question of standing *per se* but rather considered only the question of reviewability and the scope of review of that action.

The lack of standing analysis in *Airco* and *Rossetti* stems from the fact that many courts almost routinely grant standing to disappointed bidders who bring suit under the Administrative Procedure Act, following the rationale of *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 872 (D.C.Cir.1970), that doubts about standing should be resolved in favor of granting standing for bidders in cases where the public interest demands a hearing. *Scanwell* gave an expansive reading to the Administrative Procedure Act as liberalizing the common law of standing. As mentioned earlier in this opinion, the majority of courts, however, have interpreted the Administrative Procedure Act as being merely declaratory of prior common law existing at the time of its passage. The effect of the Administrative Procedure Act on the common law of standing and reviewability has been much debated. *See* Grossbaum, *supra*, n. 3. In any event, *Scanwell* and its progeny involving bidder suits under the Administrative Procedure Act do not shed much light on the instant case involving a supplier suing under a different statutory scheme. *See Morgan Associates v. United States Postal Service*, 387 F.2d 947, 950 (2d Cir. 1975). In this connection, it should be further noted that although the district court stated that it would make no sense to recognize standing for a disappointed bidder but not for Peoples Gas, the court nonetheless recognized the distinction between the present case and the bidder cases such as *Airco* and *Rossetti* (by noting that, "whereas those cases were decided under the Administrative Procedure Act . . .") and did not go so far as to find that those cases recognizing bidder standing under the Administrative Procedure Act were dispositive of the standing issue presented herein.

invocation of federal court jurisdiction and justifies the court's remedial powers on his behalf. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37, 38, 96 S.Ct. 1917, 1923, 1924, 48 L.Ed.2d 450 (1976); *Warth v. Seldin, supra; Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1961). At the threshold level of inquiry, in order to establish a personal stake in the controversy, the plaintiff must show actual or threatened injury as the result of the challenged conduct. Otherwise the exercise of federal jurisdiction would be gratuitous and inconsistent with the Article III limitation. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. at 99, 99 S.Ct. at 1608, citing *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 28, 96 S.Ct. at 1919. In addition, the plaintiff must demonstrate a "fairly traceable causal connection between the claimed injury and the challenged conduct." *Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978), and that the injury is "likely to be redressed by a favorable decision." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. at 100, 99 S.Ct. at 1608, citing *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 38, 96 S.Ct. at 1924.[8]

■ Peoples Gas meets the threshold requirement of injury in fact. It alleges a loss of future revenue as a result of the Postal Service's decision to specify an electric rather than a gas heating facility. We recently held that an allegation of economic harm to a competitive interest was sufficient to satisfy the injury in fact requirement of standing. *Marshall and Ilsley Corporation, supra,* 652 F.2d at 692–93. For that holding we relied on a line of Supreme Court cases which based standing on competitive injury. *Investment Company Institute v. Camp*, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Arnold Tours v. Camp*, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). We entertain no serious doubt that the competitive injury alleged by the plaintiff here was caused by the adverse decision of the Postal Service officials. Furthermore, we find that the requested relief—an order requiring the Postal Service to reassess the available heating sources—offers at least a likelihood of remedying the alleged harm.[9]

The second test for standing was enunciated by the Supreme Court in *Association of Data Processing Service Organizations v. Camp, supra.* In that case the Court first distinguished its earlier holding in *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), that "the question of standing is related only to whether the dispute will be presented in an adversary context and in a form historically viewed as capable of judicial resolution," by noting

**8.** Certain prudential limitations have been developed in this connection which need mentioning: litigants normally must assert injury peculiar to themselves or to the class of persons to which they belong rather than those shared in substantially equal measure by all or a large class of citizens; litigants must also assert their own legal interests rather than those of third parties. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. at 100, 99 S.Ct. at 1608, citing *Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205. No substantial problem is presented by this case with respect to the fulfillment of these requirements by Peoples Gas.

**9.** Contrary to the United States Attorney's contention, the requested relief does not appear to be "purely speculative." A court ordered reassessment by Postal Service officials would involve a narrow choice of one of two alternatives—either gas or electricity (gas being clearly the economically superior choice)—thereby offering at least a likelihood that the plaintiff's competitive injury will be redressed through a favorable Postal Service decision as a result of the reassessment. The mere fact that, as pointed out by government counsel, the Postal Service refused to change their decision once the plaintiff informed the defendants of the grounds for its objections and the results of the study that Peoples Gas conducted prior to instituting this suit, does not necessarily indicate that a negative decision would be forthcoming upon a court ordered reassessment. The reassessed decision would have to be transmitted through the Postal Service chain of command for final reconsideration and decision by the Postal Service Board of Governors, which has not heretofore been presented with the revised data submitted by Peoples Gas on the relative merits of gas versus electric heat.

that, "*Flast* was a *taxpayer's* suit. The present is a *competitor's* suit. And while the two have the same Article III standing point, they do not necessarily track one another." 397 U.S. at 152, 90 S.Ct. at 829 (emphasis in original). Apart from the case or controversy test, the Supreme Court held that the question of standing concerns "whether the interest sought be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee." The Court thereby sought to overturn prior doctrine that was read into the Administrative Procedure Act that competitors would not have standing unless the right invaded was a legal right, which standard the Court viewed in *Data Processing* as going to the merits.

▮▮▮▮ The zone of interest test is a generous standard which nonetheless serves as a limitation, albeit loosely defined, on those who can use the federal courts to resolve complaints arising from agency action taken pursuant to a particular statutory mandate where there exists no specific congressional authorization of review.[10] *Tax Analysts and Advocates v. Blumenthal*, 566 F.2d 130, 140 (D.C.Cir.), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The zone of interest test focuses upon the proper relationship between the legislative and judicial branches of government. It serves the purpose of "allowing courts to define those instances where it believes the exercise of its power at the instigation of a particular party is not congruent with the mandate of a legislative branch in a particular subject area." *Control Data Corp. v. Baldridge*, 655 F.2d 283, 297 (D.C.Cir.1981), quoting *Tax Analysts and Advocates, supra.*

Turning now to a specific application of the zone of interest test to the instant case, we examine the language of the relevant statutory provisions, the pertinent regulations, and the legislative history to discern the parameters of the relevant zone of interest to be protected or regulated and to determine whether the interest of Peoples Gas arguably falls within the zone. *Control Data Corporation, supra*, at 293. Compare *Tax Analysts and Advocates v. Blumenthal*, 566 F.2d at 141–42 (requiring "an interest which is arguable from the face of the statute.").

The district court found that the Postal Service decision to construct an electric heating facility was not fully justified and was therefore made in violation of a capital

**10.** As we recently observed in *Marshall and Ilsley Corporation, supra*, at 693, the zone of interest requirement is a prudential limitation which has not been extensively developed by the Supreme Court since *Data Processing*. In the absence of guidelines by the Supreme Court, application of the zone test has proven difficult. *Local 2855, AFGE (AFL–CIO) v. United States*, 602 F.2d 574 (3d Cir. 1979); *Tax Analysts and Advocates, supra*, 566 F.2d at 152. Although the "second prong" of the test for standing announced in *Data Processing* has been criticized, *see, e. g.*, K. Davis, *Administrative Law of the Seventies* § 22.02–11, at 509–16 (1976); *Id.*, § 522.00–7 at 181 (Supp.1977); Note, 29 Stan.L.Rev. 323 (1977), it has never been expressly repudiated by the Supreme Court. Thus, we believe, as conceded by one district court, that "it is certainly not for us to ignore a holding of that Court." *Southern Mutual Help Ass'n v. Califano*, 574 F.2d 518, 523 (D.C.Cir.1977). We think that the holding of *Data Processing* does not leave room for discretion as to whether or not to apply the test in the instant case involving an alleged regulatory violation. Only an overly-literal reading of dictum in *Gladstone*, 441 U.S. at 100, 99 S.Ct. at 1608, stating that, "There are other nonconstitutional limitations on standing to be applied in *appropriate circumstances*" would suggest the contrary—that the zone of interest is not a rule of strict application (emphasis added). We adopt the view expressed by the District of Columbia Circuit in *Tax Analysts and Advocates v. Blumenthal*, 566 F.2d at 137, n.37, that the district courts have a duty to apply the prudential limitations laid down by the Supreme Court:

> We believe that the fact that the limitations of the standing doctrine beyond injury in fact are termed "prudential limitations" does not mean that the lower courts have discretion as to whether to apply these limitations or not. The Supreme Court has announced these prudential limitations in its supervisory capacity over the federal judiciary and, in the context of cases such as the one now before us, we believe there is a nondiscretionary duty to apply the limitations. This duty to apply the standard does not detract from the discretion involved in determining whether the standard has been satisfied.

investment policy embodied in Publication 191, section 3.14 of the Capital Investment Implementation Instructions. That regulation does not mention suppliers or otherwise evidence a congressional intent to protect or regulate the competitive interests of suppliers. Nor is a protective intent evidenced by other Postal Service regulations or provisions of the Postal Reorganization Act.[11] The legislative history of the Act reveals that the purpose of the Act was to reform totally the Nation's postal system so as to,

> Eliminate serious handicaps that are now imposed on the postal service by certain legislative, budgetary, financial, and personnel policies that are outmoded, unnecessary, and inconsistent with modern management in business practices that must be available if the American public is to enjoy efficient and economical postal service.

1970 U.S.Code Cong. & Ad.News, p. 3650. From this and other pertinent language of the legislative history, it is clear that the Act seeks to protect the public's interest in efficient and economical postal service. The plaintiff appears to agree with this interpretation of the relevant zone of interest protected by the Act. In its brief on appeal, Peoples Gas correctly points out that:

> The public has an interest in the Postal Service' compliance with their regulations regarding cost control. When the Postal Service needlessly inflates its cost of doing business, all citizens are harmed through higher postal rates and through the Postal Service subsidies from general tax revenues. Certainly, it is in the public interest that Postal Service capital expenditures be cost effective.

Brief for Plaintiff-Appellee, p. 29. From the above statement it cannot be gainsaid that the public has an interest in Postal Service compliance with its regulations regarding cost control in view of the possible adverse effect that inflated Postal Service capital expenditures might have on postal rates and taxes. Accordingly, the public has an interest in Postal Service compliance with cost control regulations insofar as it impacts upon the public's enjoyment of economical postal services. Thus, the public has what may be characterized as a consumer interest in receiving economical postal services. By contrast, it is clear that the competitive interests of Peoples Gas under these circumstances, although tangentially concerned with efficient and economical postal service operations, is different in kind from the public's consumer interest. Only the consumer interest in postal services is arguably within the zone of interest protected by the Act.[12] Inasmuch as Peoples Gas does not possess such an interest in postal services, its claim does not arguably fall within the zone of interest protected by the Act and related postal regulations.

In *Marshall and Ilsley Corporation, supra,* we recently denied the standing of certain banks challenging a determination of an emergency by the Comptroller of the Currency under the Bank Merger Act, 12 U.S.C. § 1828(c). We determined that the general interest in competition of the plaintiffs did not match the particular competitive interests of that statute in preventing antitrust violations. In support of our holding in that case, we relied on *Control Data*

---

11. For the purpose of applying the zone test in the instant case, we find it appropriate to examine both the general provisions of the Act and the regulations adopted thereunder as well as the particular provision upon which this lawsuit is based since these provisions appear to share an identity of purpose. *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 999 (D.C.Cir.1979), *cert. denied,* 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980); *Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183, 1188–1189 (D.C.Cir. 1972). *See Tax Analysts & Advocates v. Blumenthal,* 566 F.2d at 140–41.

12. The interests of the *users* of postal services are clearly protected by the Act. Under the Act, public notice and hearing is accorded to "users of the mail" whenever the Postal Service proposes a change in the nature of postal services affecting service on a nationwide basis (39 U.S.C. § 3661); administrative review is provided for rate and service complaints (39 U.S.C. § 3662) and judicial review of postal rate orders issued by the Board of Governors is provided for "persons aggrieved" (39 U.S.C. § 3628).

*Corporation, supra,* noting that the District of Columbia Circuit in that case held that the interests of the plaintiffs were not within the zone of interest of a statute where their competitive interests did not match the particular interest in competition regulated or protected by the statute.

*Control Data* involved a suit by suppliers of computer systems and equipment for the government challenging the promulgation of standards for the procurement of automatic data processing equipment by the Secretary of Commerce under the Brooks Act, 40 U.S.C. § 759, an amendment to the Federal Property and Administrative Services Act of 1949, 40 U.S.C. § 471. Although both statutes expressed congressional interest in economical and efficient procurement of property, and a belief that maximization of competition was an important means to its objective, the court concluded that the interest in competition expressed in the statutes was not congruent with the interest in competition asserted by the suppliers of computer equipment which the court viewed as "rooted in economic self-preservation." 655 F.2d at 295. The legislative history revealed that competition was not valued in itself, but rather for the benefits it could bring the government, so that increased competition was expected to inure to the benefit of the government and thereby the public rather than to the suppliers. Other circuits have denied standing where the asserted interests were perceived to be incongruous with the interests protected by statute. *See, e. g., Roadway Inns of America, Inc. v. Frank,* 541 F.2d 759 (8th Cir. 1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977); *Churchill Truck Lines v. United States,* 533 F.2d 411 (8th Cir. 1976); *Clinton Community Hospital v. South Maryland Medical Center,* 510 F.2d 1037 (4th Cir.), *cert. denied,* 422 U.S. 1048, 95 S.Ct. 2666, 45 L.Ed.2d 700 (1975); *Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971). *See also Sierra Club v. Froehlke,* 486 F.2d 946 (7th Cir. 1973).[13]

Peoples Gas's argument regarding standing is twofold: First, that under concepts of standing that are now purportedly well established, the injury in fact which it has sustained is by itself sufficient to confer standing.[14] Second, that having shown in-

---

**13.** On the other hand, as noted by *Control Data, supra,* at 294, the zone of interest test gives the court considerable latitude to define the scope of the relevant zone. As a consequence, some courts have defined the relevant zone more broadly to include interests that are not so closely aligned. *See, e. g., Constructores Civiles de Centroamerica, S.A. v. Hannah,* 459 F.2d 1183 (D.C.Cir.1972); *Diggs v. Shultz,* 470 F.2d 461 (D.C.Cir.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973). In this connection the court in *Constructores* stated that "slight beneficiary indicia" will be sufficient to sustain a party's assertion of standing, *id.* at 1189, quoting *Barlow v. Collins,* 397 U.S. at 175–76, 90 S.Ct. at 842–43. Even given this minimal intent requirement, like the court in *Control Data,* we find in this case that the relevant statutory provisions and the legislative history reveals *no* evidence of an intent to protect or benefit the competitive interests of the plaintiff.

**14.** For the proposition that injury in fact alone confers standing, plaintiff cites *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Association of Data Processing Service Org. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Merriam v. Kunzig,* 476 F.2d 1233 (3d Cir.), *cert. denied,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973). In *Sierra Club,* the Supreme Court did not discuss the zone test but simply noted that they "do not reach the test or its possible application." 405 U.S. at 733, n.5, 92 S.Ct. at 1365. However, the plaintiff in that case failed to fulfill the threshold requirement of injury in fact, making consideration of the zone test unnecessary. *See Harrington v. Bush,* 553 F.2d 190, 205 (D.C.Cir.1977) ("[the zone test] is not a constitutional requirement ... and need not be faced in the absence of a finding of injury"). *See generally,* 5 B. Mezines, J. Stern, & J. Gruff, *Administrative Law* § 50.03 at 50.28 n.10 (1980). In *Merriam,* the Third Circuit expressly determined that the appellant was within the zone of interest, and in a footnote by way of dictum expressed a willingness to recognize standing even on the assumption that the appellant did not fall within the zone of protected interests. 476 F.2d at 1242, n.7 (discussed *infra*). Finally, in *Association of Data Processing,* and in its companion case, *Barlow v. Collins,* the Supreme Court first enunciated and applied the zone of interest test. Consequently, those cases cannot be seen as standing for the notion that injury in fact is sufficient to confer standing.

jury in fact, it can assert the public interest as a "private attorney general" and thereby satisfy the zone test.

■ We expressly rejected the argument that a showing of injury in fact alone is sufficient for standing in *Marshall and Ilsley Corporation*, where we stated:

This circuit consistently has required satisfaction of the zone of interests test for standing.[15] *Bradford School Bus Transit, Inc. v. Chicago Transit Authority*, 537 F.2d 943, 946 (7th Cir. 1976), *cert. denied*, 429 U.S. 1066 [97 S.Ct. 797, 50 L.Ed.2d 784] (1977); *Apter v. Richardson*, 510 F.2d 351, 353 (7th Cir. 1975). Although the Supreme Court has not elaborated on the zone of interest standard recently, the standard is still referred to by the Supreme Court as an element of the test for standing. We further are persuaded of the standard's continuing vitality by the thoughtful and detailed discussion in *Control Data Corp. v. Baldridge*, 655 F.2d 283, 289–291 (D.C.Cir.1981). *See also Tax Analysts & Advocates v. Blumenthal*, 566 F.2d 130, 138–43 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1086 [98 S.Ct. 1280, 55 L.Ed.2d 791] (1978).[16]

*Marshall and Ilsley Corporation*, 652 F.2d 685, at 693 (7th Cir. 1981) (footnotes omitted).

Moreover, Peoples Gas's reliance upon *Sierra Club v. Morton*, 405 U.S. at 737, 92 S.Ct. at 1367, for the proposition that satisfaction of the injury in fact test qualifies a plaintiff to assert a protected public interest, is misplaced. This argument was considered by the First Circuit in *Rhode Island Committee on Energy v. General Services Administration*, 561 F.2d 397, 402 n.4 (1st Cir. 1977), and found to be without merit in the absence of a showing of congressional intent to that effect. Peoples Gas cannot rely upon *Sierra Club* because under the clear dictates of that case, review is only "properly invoked" by a party "upon whom Congress has conferred the right to seek judicial review." *Sierra Club v. Morton, supra*, 405 U.S. at 737, 92 S.Ct. at 1367 citing *Data Processing, supra*. Clearly, Peoples Gas does not come within that standard. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 41, n.22, 96 S.Ct. at 1926, n.22. *See also Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206, ("But so long as this [injury in fact] requirement is satisfied, persons to whom Congress has granted a right of action, either expressly or by clear implication, may have standing . . . and indeed, may invoke the general public interest in support of their claim."), citing *Sierra Club v. Morton, supra; EEOC v. General Tel. Co. of the Northwest, Inc.*, 599 F.2d 322, 327 (9th Cir. 1979), *aff'd, General Tel. Co. v. EEOC*, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980); *Dupree v. United States*, 559 F.2d 1151, 1154 (9th Cir. 1977); *Evans v. Hills*, No. 74–1793 (2d Cir. 1976); *(City of) Davis v. Coleman*, 521 F.2d 661, 672 n.14 (9th Cir. 1975). *See generally*, M. Tushnet, *The New Law of Standing: A Plea for Abandonment*, 62 Cornell L.Rev. 663, 667 (1977).

In support of its second claim, Peoples Gas asserts that it is within the protected zone of interest because an injury in fact coupled with the public interest serves to confer standing upon it as a "private attorney general" to assert the interests of the public in postal service compliance with its statutory charges and regulations. Contending that other circuits have found

---

**15.** But *see* n.7, *supra.*

**16.** A footnote appearing in the above quotation makes reference to cases listed in *Control Data Corporation v. Baldridge*, at 291 n.12, wherein the Supreme Court refers to the zone of interest standard in cases decided after *Data Processing; Sierra Club v. Morton*, 405 U.S. 727, 733 n.5, 92 S.Ct. 1361, 1365 n.5, 31 L.Ed.2d 636 (1972); *United States v. Scrap*, 412 U.S. 669, 686 n.13, 93 S.Ct. 2405, 2415 n.13, 37 L.Ed.2d 254 (1973); *Simon v. Eastern Kentucky Wel-fare Rights Organization*, 426 U.S. 26, 39 n.19, 96 S.Ct. 1917, 1925 n.19, 48 L.Ed.2d 450 (1976); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100 n.6, 99 S.Ct. 1601, 1608 n.6, 60 L.Ed.2d 66 (1979). Other examples are *United States v. Richardson*, 418 U.S. 166, 176 n.9, 94 S.Ct. 2940, 2946 n.9, 41 L.Ed.2d 678 (1974), and *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 224 n.14, 94 S.Ct. 2925, 2933–34 n.14 (1974). *See generally*, 5 B. Mezines, *supra*, n.14.

standing under such circumstances, Peoples Gas cites *Merriam v. Kunzig, supra* n.14, and quotes language from *Scanwell Laboratories Inc. v. Shaffer,* 424 F.2d at 864, approving the concept of a suit brought by a bidder as a "private attorney general" to vindicate the public interest in preventing the granting of illegal contracts through arbitrary and capricious action. As we noted earlier, however, the Third Circuit in *Merriam* specifically found that the plaintiff in that case satisfied the zone of interest test. At the same time, that opinion paid homage to the "private attorney general" concept of standing and expressly adopted the holding of *Scanwell.* It is interesting to note that the *Merriam* court first found that the losing bidder had standing under the doctrine of *Scanwell,* and then in response to the government's objection that *Scanwell* was inconsistent with *Data Processing, supra,* and *Barlow v. Collins, supra,* the court proceeded to find that the zone test had been satisfied by the disappointed bidder's claim.[17]

The *Control Data* court considered the same argument advanced here. It observed that in none of the post-*Data Processing* cases cited by the suppliers did the court actually base its grant of standing solely upon an assertion of economic injury, but in each case either explicitly applied the zone test, as in *Merriam, supra* n.14, and *Constructores Civiles de Centroamerica, supra* n.13, or discerned a congressional intent to protect the interests of the claimant from the relevant legislative history, as in *Ballerina Pen Co. v. Kunzig,* 433 F.2d 1204 (D.C. Cir.1970), *cert. denied,* 401 U.S. 950, 91 S.Ct.

1186, 28 L.Ed.2d 234 (1971). Concluding that it could not find standing for the suppliers on such authority, the *Control Data* court offered other reasons for its refusal to extend the *Scanwell* doctrine:

> Even were we to read those cases as broadly as appellants request, however, we would be unable to justify the extension of the *Scanwell* rationale to these circumstances. Appellants here cannot claim the special relationship found by the *Merriam* court to exist between a bidder and the government; unlike the bidder in the context of a solicitation, they have not "placed in the hands of the representatives of the Government the power to bind [them] to a contract." 476 F.2d at 1242 n.7. Appellants cannot, moreover, claim the special injury discerned in *Ballerina Pen*—absolute preclusion from the government market. They are instead free to decide whether to conform to the proposed specifications or to withdraw from the government market. We find in this case, then, none of the special factors present in the bidder cases which made a grant of standing particularly appropriate.

■ The power of the government to bind the bidder into a contract has long been viewed as giving rise to a correlative obligation of fair dealing on the part of the government within the terms of the solicitation. *See generally,* Note, *Judicial Review and Remedies for Unsuccessful Bidders on Federal Government Contracts,* 47 N.Y.L.Rev. 496, 500, 501 (1972); J. Grossbaum, *Procurement Regulations,* at 241, *supra* n.3.[18] Peoples Gas, of course, has nei-

---

**17.** As in *Merriam, supra,* many courts do not expressly acknowledge any inconsistency between *Scanwell, supra,* and *Data Processing, supra,* but apply both *Scanwell,* for the general proposition that unsuccessful bidders have standing, and *Data Processing* for the zone test. *See, e. g., Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260 (5th Cir. 1978); *Hayes Int'l Corp. v. McLucas,* 509 F.2d 247 (5th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); *Ellsworth Bottling Co. v. United States,* 408 F.Supp. 280 (D.Okl.1975). *Cf. Allen M. Campbell Co. Gen. Con., Inc. v. Lloyd Wood Construction Co.,* 446 F.2d 261, 264 n.5 (5th Cir. 1971). This may reflect the fact that in

*Scanwell* the court "[came] close to articulating such a 'test' " and arrived at a decision "not inconsistent with later decisions applying the zone of interest test." *Control Data, supra,* at 288.

**18.** It has been said that the holding of *Scanwell* is merely an extension of the reasoning of the debarment cases which allowed plaintiffs standing to challenge the unlawful termination of an existing beneficial business relationship. *Scanwell* is thus consistent with the right recognized in *Heyer Products Co. v. United States,* 140 F.Supp. 409 (Ct.Cl.1956), and *Copper Plumbing & Heating Co. v. Campbell,* 290 F.2d

ther a present nor a prospective contractual relationship with the Postal Service. At present, Peoples Gas does not even deal directly with the Postal Service but through the Chicago Union Station Company which furnishes steam heat to the Main Post Office Building that has been generated by gas supplied by Peoples Gas. We find that this situation presents a tenuous basis for application of the *Scanwell* rationale and we adopt the reasons expressed in *Control Data* for refusing to extend the *Scanwell* doctrine to find standing for disappointed suppliers. The mere fact that Peoples Gas has a monopoly over gas supplies does not persuade us otherwise. We are convinced that the obligation of fair dealing on the part of the government, noted by the court in *Merriam*, 476 F.2d at 1242, n.7, and implicit in the *Scanwell* rationale for finding standing for disappointed bidders, does not arise under these circumstances.

 The Seventh Circuit has never recognized standing for a plaintiff based solely on private attorney general status. We are aware of no post-*Data Processing* case that explicitly does so, nor has Peoples Gas cited any such case to us. We believe that the plaintiff must assert an interest of its own that is arguably protected by the Postal Reorganization Act or regulation promulgated thereunder. The assertion of private attorney general status based solely on injury in fact is insufficient for standing.[19] Cf. *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 999, n.22 (D.C.Cir. 1979), and cases cited therein ("A party will

be denied standing if his alleged injury is to an interest that is not arguably within the zone of interests protected by the statute in question, even though injury in fact has been sufficiently established.").

Having failed to demonstrate a congressional intent to protect or regulate its competitive interests and thus satisfy the zone of interest requirement for standing, Peoples Gas' objection to the Postal Service's procurement decision is governed by the traditional doctrine of judicial non-interference in government procurement expressed in *Perkins v. Lukens Steel*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). *Perkins* articulated the principle that, "like private individuals and business, the Government enjoys the unrestricted power ... to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." 310 U.S. at 127, 60 S.Ct. at 876.[20] We recently applied this principle in *Coyne Delaney Co. v. Capital Development Board of the State of Illinois*, 616 F.2d 341 (7th Cir. 1980), to deny standing to a Government supplier who brought a civil rights action against the state purchasing agent that specified another manufacturer's flush valves for installation in a state prison. We noted that the concepts of standing may have changed since *Perkins*, but that the underlying rationale of *Perkins* has not changed: "[t]he government enjoys a broad freedom to deal with whom it chooses on such terms as it chooses; no one has a 'right' to sell to the

368 (D.C.Cir.1961), of a party to be treated fairly and to be accorded equal opportunity in seeking contracts with the Government. J. Grossbaum, *supra*, at 244.

19. We agree with the observation made by one commentator that:

Ascribing status as a private attorney general to a party who has been directly aggrieved unnecessarily distorts the standard of "injury in fact." In addition, to accord a party standing only under the rubric of a private attorney general vindicating the public interest is tantamount to dispensing with the requirement that a litigant have an actual personal interest in the controversy. It is highly artificial and unrealistic to require that a party aggrieved in fact bear the mantle of the

public interest in order to get his day in court, and Professor Davis claims to know of no federal case in which a plaintiff was held to have standing without asserting an interest of his own.

J. Grossbaum, *supra*, at 245.

20. *Perkins* recognized an exception to the traditional rule of judicial non-interference where Congress has by "constitutional legislation" recognized the legal right of a bidder for government contracts to benefit from a policy of granting a fair share of such contracts to small businesses." 310 U.S. at 125, 60 S.Ct. at 875. The plaintiff here certainly cannot fit within that exception which is stricter than the zone test.

government that which the government does not wish to buy." 616 F.2d at 342. We there observed that as a supplier who hoped to sell goods through a wholesaler to bidders on a state contract, the plaintiff was clearly in no better position than a bidder who would under similar circumstances be subject to the rule expressed in *Perkins* that government has "an adequate range of discretion free from vexatious and dilatory restraint at the suit of prospective or potential sellers." *Id.*

Application of the policy of judicial restraint in the area of governmental procurement expressed in *Perkins* is particularly appropriate in the instant case. Like the court in *Control Data* we find that the circumstances of this case "offer[s] the potential for impermissible intrusion upon the government's prerogative to dictate specifications for the product it wishes to purchase." *Supra*, at 293.[21] The legislative history of the Postal Reorganization Act expresses a strong congressional interest that the Post Office Department be allowed to operate in a businesslike manner. In recounting the problems experienced by Postal Service operations in the past, including the "delay, breakdown, errors, damage and other inconvenience to the public [that] have become more and more frequent," Congress made several proposals for overcoming the shortcomings of the Post Office Department, one of those being that, "Top management must be given authority, consistent with its responsibilities, to provide an efficient and economical postal system. Postal management has been severely and unjustly hampered in its efforts to administer the Department in a businesslike way." 1970 U.S.Code Cong. & Ad.News, p. 3653. Thus Congress sought to convert the Post Office Department into an "independent establishment of the executive branch of the Government," 39 U.S.C. § 201, with authority to conduct the affairs of the Postal Service on a businesslike basis, while retaining the public service character

---

21. We realize that our discussion of the traditional policy of nonreviewability in the area of government procurement touches upon matters that may not seem germane to the narrow question of whether Peoples Gas has standing under the regulatory scheme that governs the Postal Service. However, we are persuaded by Professor Jaffe's reasoning that both issues of "access standing" and justiciability may enter into a decision under the general rubric of standing when a case presents "troublesome questions about the suitability of the issues tendered for decision by the judiciary":

Insofar as standing does involve a consideration of the legal issues raised, the concern is supposed to be with protective intent, not with the suitability of the issues for judicial determination. Thus, while the denial of standing has the effect of removing a case from the reach of judicial determination, its function is to ration scarce judicial resources, not to determine the proper scope of judicial policymaking responsibility. In short, standing narrowly and properly refers to access standing; and where the above distinctions can be applied in practice, there is considerable merit in Professor Davis' suggestion that courts should talk about standing only when their decisions are based on standing considerations. Where the grounds for their refusal to hear a case are otherwise, they should discuss justiciability, reviewability, or whatever is the appropriate term to describe those grounds.

However, courts sometimes blend together discussions of standing with these other doctrines, and the reason for the blending is not always intellectual carelessness. A particular case may raise issues of both access standing and justiciability. The application of both these doctrines is difficult, for in the area of justiciability as well as standing courts lack clear rules for making a decision. But since both doctrines relate to the same ultimate question of whether the merits of the case should be decided, it may be proper for the court, after formulating its views on each of the two issues separately, to take both into consideration in attempting to resolve that question. The resulting decision, even when referred to as a standing decision, clearly involves a different use of that doctrine than the one considered above under the heading of access standing. Here the extent and kind of injury suffered by the plaintiff is but one variable in a multivariable equation which leads to a conclusion to render decision or not. The court may in effect set a still higher access threshold, in terms of the severity or kind of plaintiff's injury or magnitude of his stake, when the case presents troublesome questions about the suitability of the issues tendered for the decision by the judiciary.

Jaffe, at 684–85.

of the Nation's mail system. 1970 U.S.Code Cong. & Ad.News, at 3654. The exemption of the Postal Service under the Act, from "all federal law dealing with public or Federal contracts, property, works . . . budgets or funds," including the provisions of the Administrative Procedure Act, is in keeping with this general policy. *See* 39 U.S.C. § 410. This court has previously recognized that Congress intended that the Postal Service operate in a "businesslike" fashion with the powers set forth in 39 U.S.C. § 401 to enter into contracts, keep accounts, and lease property in common with any business organization. *Standard Oil Div., American Oil Co. v. Starks*, 528 F.2d 201, 202 (7th Cir. 1975), citing *Beneficial Finance Co. of New York, Inc. v. Dallas*, 571 F.2d 125, 128 (2d Cir. 1978). It is significant in this regard that the Postal Service's decision to choose electric heat would have been unassailable if made by a private business after which the Postal Service is modeled.

■ In view of the strong interest expressed by Congress in promoting the operational efficiency of the Postal Service, and Congress's express desire that the Postal Service operate in a businesslike fashion, we believe that it is inappropriate under the present circumstances to subject the Postal Service's procurement decision here under consideration to judicial scrutiny. *Morgan Associates v. United States Postal Service*, 387 F.Supp. 947 (S.D.N.Y.1975), *aff'd on other grounds*, 511 F.2d 1223 (2d Cir. 1975). Thus we should heed the caveat expressed in *Perkins* that,

> Courts should not, where Congress has not done so, subject purchasing agencies of the Government to the delays necessarily incident to judicial scrutiny at the instance of potential sellers. . . . A like restraint applied to purchasing by private business would be widely condemned as an intolerable business handicap.

310 U.S. at 130, 60 S.Ct. at 878. Of course, we realize that militating in favor of standing for Peoples Gas is the fact that it is the only party that could conceivably challenge the decision of the Postal Service here at issue. Moreover, we are mindful of the strong impulse that arises in such situations that where an alleged violation of an agency regulation could foreseeably result in serious harm to the public interest, the courts should intervene to prevent that event. We ought not, however, muse about the ultimate wisdom of the Postal Service's decision in choosing electricity over gas and whether electricity might prove the better choice over the long run, even though it is clearly the more expensive alternative according to present estimates. To so speculate would be to delve too far into the merits of the plaintiff's complaint, which we have already decided should not have been entertained by the district court.

The injunction order is reversed and the district court is directed to dismiss the complaint.

WILLIAM J. CAMPBELL, Senior District Judge, dissenting.

I agree with the majority insofar as it concludes that the District Court had subject matter jurisdiction, and that the plaintiff has satisfied the constitutional requirements for standing. However, I cannot agree that prudential considerations require us to deny the plaintiff standing. The majority's blind adherence to the zone of interest test fails to consider the nature and purpose of the rule and results in a decision which is inconsistent with the legislative intent of the Postal Reorganization Act.

The prudential considerations of standing as promulgated by the Supreme Court are not strict rules, but rather are standards of judicial self-governance designed to "limit access to those litigants best suited to assert a particular claim," *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). The zone of interest test is one of the "prudential considerations,"[1] and is to be applied

---

1. The two other prudential considerations can be dealt with summarily. The plaintiff in this case is not asserting the rights of third parties (although arguing that once it has standing it can assert the public interest, see *Sierra Club v. Morton*, 405 U.S. 727, 737, 92 S.Ct. 1361, 1367,

only in "appropriate circumstances," [2] *Gladstone*, 99 S.Ct. at 1608, ft. 6. The determination of those "appropriate circumstances" requires a pragmatic approach;

"The various rules of standing applied by federal courts have not been developed in the abstract. Rather they have been fashioned with specific reference to the status asserted by the party whose standing is challenged and to the type of question he wishes to have adjudicated." *Flast v. Cohen*, 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968).

The plaintiff's claim in this case is that the Postal Service did not choose the most cost-efficient energy source and did not fully justify that decision. The injury alleged is the loss of future profits which the plaintiff would have received had the admittedly most cost-effective alternative been chosen.

The legislative history of the Postal Reorganization Act states as the basic proposition of the reorganization:

"that the management of the Postal Service should be given the powers needed to manage well *and then should be held strictly responsible for the proper use of those powers.*" (emphasis supplied) 2 U.S.Code Cong. & Admin.News 1970, p. 3669.

The major concern of Congress was that the Postal Service operate efficiently;

"The Postal Service is—first, last and always—a public service. H.R. 17070 is designed to prevent public service from involving public wastefulness in postal matters. This must be done not only by requiring postal management to operate efficiently and economically, but also by requiring it to seek out the needs and desires of its present and potential customers—the American public." 2 U.S. Code Cong. & Admin.News 1970, p. 3668.

This concern is reflected in the legislation itself, see 39 U.S.C. § 101(g). The majority notes the legislative history of the Act and concludes that it was designed to protect the public's interest in an efficient postal service. Thus, it delineates the zone of interest as the public's consumer interest in an economical postal service. Since Peoples Gas asserts a competitive interest, the court concludes that it lacks standing to enforce the Act.

The decision is illogical in that, under its reasoning, no one can have standing to require the Postal Service to be efficient in this situation (or probably any other). Members of the general public, the only parties capable of satisfying the majority's zone of interest formulation, would not have standing because the only injury they could allege would be "shared in substantially equal measure by all or a large class of citizens," see *Warth*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975); and ft. 1 *supra*. While there has been much discussion in this case about the standing of frustrated bidders, it is clear that they could never challenge this action by the Postal Service. Once the energy source is chosen, the appropriate specifications for the construction project will be formulated. Since the bidders on the project will base their bids on those specifications, a frustrated bidder would not be able to "go behind" the specifications, i. e., show particularized injury caused by a decision made prior to the formulation of the specifications.

The decision of the Postal Service can only be challenged by Peoples Gas and only at this stage of the project. The majority concedes this point but feels compelled to apply the zone of interest test, and therefore deny Peoples Gas standing.

31 L.Ed.2d 636 (1972)), nor is it alleging an injury "shared in substantial equal measure by all or a large class of citizens," *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1974). The majority agrees that these considerations do not operate to deny the plaintiff standing in this case, see ft. 8 *supra*.

2. The majority suggests in ft. 10 that this is an overly-literal reading of dictum. I do not per-

ceive it in that manner, but simply as an intelligent reading of an unambiguous statement. In my view, the majority chooses to minimize the import of the statement and to ignore its plain meaning. However, considering the meager and cryptic guidance offered the courts in applying the zone of interest test, such differences are bound to occur.

The majority describes the zone of interest test as a means of

"allowing courts to define those instances where it believes the exercise of its power at the instigation of a particular party is not congruent with the mandate of a legislative branch in a particular subject area." Citing *Control Data Corp. v. Baldridge*, 655 F.2d 283, 297 (D.C.Cir.1981), quoting *Tax Analysts and Advocates, supra.*

This merely emphasizes the incongruity of the decision in this case. It seems to me that what the Court has done is to decide that it is incapable of enforcing the legislative intent because of a judge-made rule designed to implement legislative intent.

As stated earlier, the zone of interest test, as with all the prudential considerations, is designed to insure that the litigant best suited to assert a particular claim is before the court. Peoples Gas has satisfied the constitutional requirements of standing, and it diligently and thoroughly pursued its claim. As conceded by the majority, Peoples Gas is the only party that could raise this claim, and having satisfied the constitutional limitations of standing it must be the appropriate litigant. To apply the zone of interest test in this situation does not ensure that the proper litigant is before the court, but merely eliminates the claim by compelling the conclusion that there is no appropriate litigant. Thus, a situation is created in which "the most injurious and widespread government actions could be questioned by nobody," *United States v. SCRAP*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). The Supreme Court stated in that case that it could not accept such a conclusion. I cannot accept it either.

The majority notes that the prudential considerations of standing are designed to restrict the court to its appropriate ambit. However, I do not believe the district court exceeded its proper role in this case. It should be noted that this is not the type of decision that Congress can effectively over-see and influence. This is not a situation involving the promulgation of a regulation or policy which would eventually be reviewed and perhaps amended by Congress such as existed in *National Association of Postal Supervisors v. United States Postal Service*, 602 F.2d 420 (D.C.Cir.1979) and *Control Data Corporation v. Baldridge*, 655 F.2d 283 (D.C.Cir.1981). By the time the decision as to the energy source is made and construction of the appropriate plant is commenced, "the die is cast" for the forty-year life of the project.

Additionally, this case is not similar to *Winpisinger v. Watson*, 628 F.2d 133 (D.C. Cir.1980), in which the plaintiffs sought the court to exercise a continuing regulatory role over a part of the Executive Branch. The district court in this case did not substitute its judgment for that of the Postal Service, but merely compelled it to come to a decision based on truthful facts properly presented.

While I admire the majority's desire to apply *stare decisis*, I believe they go too far. The Supreme Court's directives are a guide to legal reasoning and are not, like the pronouncements of the Medes and Persians, etched in stone. As noted earlier, I believe the Supreme Court has given sufficient indication that the zone of interest test, like the other prudential considerations of standing, is not immutable. Indeed, the Court has stated that "generalizations about standing are largely worthless," *Data Processing Service v. Camp*, 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1979).

I believe the District Court properly entered the injunction because it was necessary in the public interest. The District Judge found material misstatements of fact in the Perkins & Will Study and determined that the postal officials had violated certain of their own regulations. The court concluded that, contrary to the conclusion of the Perkins & Will Study, the choice of electricity would cost at least $55 million more than natural gas over the first twenty years of the project.[3] Thus, it was appar-

---

3. The Perkins & Will Study estimated a $30 million differential between natural gas and electricity over the first twenty years. The District Court found certain factual errors in

ent that a strong public interest supported the issuance of the injunction. As a countervailing consideration, the Postal Service argued that it was operating under severe time constraints. However, that contention is not supported in the record. The district court found that the Chicago Union Station Company could provide heat beyond the announced cancellation date. Additionally, temporary heating facilities were also a possibility. In any event, the time constraints alleged do not warrant this court abstaining from correcting the egregious errors involved in the decision. Therefore, I believe that the injunction was appropriate.

The majority notes that Congress intended the Postal Service to operate in a businesslike fashion, and that this is an additional reason why the court should not act in this matter. I would point out again that the district judge did not substitute his judgment for that of the Postal Service, but merely required that a new business decision, based on an accurate record, be made. No business institution worthy of the name would commit so much of its money by its board based upon erroneous information furnished by its employees.

Additionally, as noted previously, Congress intended that the Postal Service be held strictly responsible for the proper use of its powers. I cannot believe that Congress intended this possible malevolent situation of a $55 million ripoff to result from benevolent legislation. While I can accept that the Postal Service was intended to have greater discretion on certain decisions than other agencies, I cannot concede that it may ignore its own regulations, render a decision on materially misstated facts, and then be accountable to no one. As stated in *Nat. Ass'n of Postal Sup'rs,*

"Courts can defer to the exercise of administrative discretion on internal management matters, but they cannot abdicate their responsibility to insure compliance with congressional directives setting the limits on that discretion. Reviewability and the scope of review are two separate questions." 602 F.2d at 432.

In summary, I believe that this Court's reversal of the District Court is a grave mistake and an injustice to the public we serve. As the result of the rigid application of a vague theoretical concept, this Court stands aside while a huge sum of public funds may be wasted. Moreover, the harm is not limited to this case. Such a decision creates a bad precedent which could pave the way for future situations involving possible public waste and incompetence.

Accordingly, I would affirm the District Court and uphold the injunction.

---

the Perkins & Will Study, including a mistake as to the boiler efficiency of natural gas and a miscalculation in the economic analysis of natural gas. The latter error was of the magnitude of $25 million and indicated that the study grossly underestimated the economic differential between natural gas and electricity (see Order of District Court, p. 815, ft. 10).